The WASHINGTON POST COMPANY

v.

The UNITED STATES.

No. 388–65.

United States Court of Claims.
Jan. 24, 1969.

George G. Tyler, New York City, attorney of record, for plaintiff. Richard J. Hiegel, New York City, of counsel.

Ira M. Langer, Silver Spring, Md., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS - MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This action for refund of income taxes paid comes to us on cross-motions for summary judgment, with all facts stipulated. Plaintiff, a Delaware corporation with its principal place of business in the District of Columbia, keeps its books on the accrual basis of accounting. On its federal income tax returns for three fiscal years corresponding approximately with the calendar years 1957, 1958, and 1959, plaintiff accrued on its books $102,772, $127,518, and $152,042 respectively, as amounts due to the Post's dealer profit-sharing plan, to be described below. These amounts were deducted from the Post's gross income as ordinary and necessary business expenses, or alternatively, as circulation expenses. In an audit of plaintiff's tax returns for these years, the District Director of Internal Revenue for the District of Baltimore disallowed portions of the accrued items in the total amount of approximately $210,000, and assessed a deficiency totaling $108,453.30, together with a total of $34,458.95 in interest. The deficiencies were paid by plaintiff in June and August 1964. In April 1965, plaintiff timely filed with the District Director claims for refunds, and the claims were disallowed. Plaintiff then filed suit in this court. For the reasons stated below, we hold that plaintiff is entitled to recover $142,912.25, the amount of the assessed deficiency and interest paid, plus statutory interest thereon.

I

The overriding issue in this case is whether or not the amounts plaintiff accrued on its books as contributions to its Circulation Dealer Profit Incentive Plan (hereafter the Plan) were expenses sufficiently fixed and definite to meet the so-called "all events" test first announced in United States v. Anderson, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347 (1926). As the Plan is described in the stipulation of facts, we think the "all events" test has been met.

Plaintiff is engaged in the publication of a daily and Sunday newspaper named The Washington Post, which enjoys a large circulation in Washington, D. C., and in the surrounding suburbs of Virginia and Maryland. Since 1953 plaintiff has marketed the Post through a system of independent circulation dealers. The dealers are of three types, corresponding to three different geographic sets of newspaper purchasers: city home delivery dealers, city newsstand and street sale dealers, and suburban and country dealers. While the duties of each set of dealers differ slightly due to the unique conditions of each market, the Post's business relationship with them is sufficiently similar so that it is fair to describe a general pattern of distribution.

The Post sells its newspapers to dealers who, in turn, are responsible for selling the papers to individual newspaper purchasers. While the Post sup-

plies the dealers with promotional material, administrative help in the form of notices of new subscribers, "stops," complaints, and other forms of help and supervision, it is primarily the dealers' responsibility to hire and supervise newspaper carriers, make solicitations and collections, display the papers on newsstands, etc. The dealers buy their newspapers at wholesale price and make their profit by reselling the papers at retail. It is stipulated that the dealers are independent contractors, and not employees of the Post.

It can be seen that the Post has a vital interest in the performance of its dealers, because the Post's own profits are directly related to the volume of newspapers sold. Therefore, the Post decided to provide incentives to its dealers, both to increase volume and to maintain a continuing relationship with the Post over a period of years. To this end, the Post in 1956 proposed to establish a profit incentive plan closely resembling the one finally decided upon, but making use of the device of a trust to be created by the Post, to which annual contributions would be made. The beneficiaries of the trust were to be the dealers, whose individual shares would vest upon the happening of certain stated events. The Post sought a ruling from the Internal Revenue Service concerning tax treatment of the proposed trust. The Service informed plaintiff that it would not issue the requested rulings and, in particular, informed plaintiff that under the terms of the proposed trust, the Service would consider that the dealers would receive income in the year deposits were made to the trust and not in the year of distribution. The position taken by the Service was deemed unacceptable by the Post; accordingly, the request for a favorable ruling was withdrawn, and plaintiff did not adopt the proposed plan.

As a substitute for the proposed trust plan, plaintiff, in December 1956, announced to the dealers at a meeting the creation of the Plan, which is the subject of this controversy, and announced the amount which plaintiff determined to accrue for the year just ending. It has been plaintiff's practice to make subsequent announcements at the Post's annual Christmas party for its dealers. The first accrual in December 1956, apparently was allowed by the Internal Revenue Service, and is not involved in this suit. However, subsequent accruals were in part disallowed.

Under the Plan adopted by the Post, the paper promises, without signing any formal contract with individual dealers or with the dealers in aggregate, to accrue on its books for the benefit of eligible dealers an amount which is supposed to reflect the dealers' contribution to the Post's success for the year just ending. Thus, on or before December 31, 1956, and during the last 15 days of each succeeding year, there was and is to be accrued to the Fund: (a) an amount equal to five percent of the amount of the Fund immediately before the accrual for the current fiscal year— this provision apparently serves the function of providing interest on the amounts already credited to the Fund— and (b) such amount, if any, as the Post's Board of Directors in its discretion thinks fairly reflects the contribution made by the dealers—taken as a group—to the fiscal year's profits. The Post reserves to itself the right to discontinue or alter the Plan at any time, but irrevocably obligates itself to distribute all amounts accrued as of the time of discontinuance. In general, every dealer who has reached the age of 23 and has been a dealer continuously for three years is eligible to participate in the Plan. The rules of "vesting" of an individual member's share are as follows:

### Accounts of Members

SECTION 4.1 *Crediting of Accrual.* The Committee [the Plan's administrator] shall maintain in its records an account for each Member. The Company's accruals to the Fund for each Year shall be credited by the Committee as follows:

(a) There shall be credited to the account of each Member for such Year, who was also a member for the next preceding Year, from the accrual made pursuant to Section 2.1(a), an amount equal to 5% of such Member's account.

(b) There shall be credited to the account for each Member for such Year (whether or not he was a Member for the next preceding Year) an equal amount of the accrual, if any, made pursuant to Section 2.1(b).

All amounts so credited shall be subject to the provisions of sections 4.2 to 4.5, inclusive.

SECTION 4.2 *Irrevocable Crediting of Member's Accounts.* When a Member ceases to be a Circulation Dealer, his account shall be dealt with as follows:

(a) If, at the request of the Company, he terminates his independent contractual relationship with the Company in order to become an employee of the Company, all the amounts then in his account shall be irrevocably credited to him.

(b) If he ceases to be a Circulation Dealer because of his death, disability, or mental incompetency, or if, on the date when he ceases to be a Circulation Dealer, he has attained age 55, all the amounts then in his account shall be irrevocably credited to him.

(c) If his independent contractual relationship with the Company is terminated under any other circumstances, there shall be irrevocably credited to him an amount equal to the product obtained by multiplying the amounts then in his account by 10% for each Year (not exceeding 7) for which he was a Member.

(d) All amounts then in his account, if any, in excess of these irrevocably credited thereto as provided in subparagraphs (a), (b) and (c) above shall be allocated among the accounts of the remaining Members in the proportion which the amounts in each such account before such allocation bear to the total amount in all such accounts before such allocation.

All amounts in a Member's account shall be irrevocably credited to him in the event of discontinuance of the Plan, or in the event that there shall, at any time, be less than 25 Members of the Plan. [By vote of the Post's Board of Directors, this last paragraph was subsequently amended to provide for termination when there are fewer than 12 members of the Plan.]

It can be seen from the foregoing that the Post irrevocably committed itself to payment of whatever was accrued to the Fund, but that an individual member could not be sure of how much he would receive unless and until he became a Post employee, died or became disabled, or reached age 55. When any of these events occurred, the individual dealer would irrevocably have vested rights to all that was credited to his individual account. In all other cases, the dealer could at most have a vested right in 70 percent of the amount credited to his account. Any amount "forfeited" by any one dealer is reallocated to other dealers in the Plan. If the Plan is terminated by the Post, or automatically terminates because it has fewer than 12 members, all amounts in the accounts of then-existing members become vested. After the initial allowance of the 1956 accrual, the Commissioner disallowed in subsequent years that portion of the amount accrued, which was not immediately vested in any individual member.

The Commissioner's action was taken on the assumption that any non-vested portion of the yearly accrual is, in effect, part of a "contingent liability"—a bookkeeping entry to a reserve account— which is not deductible until all events which fix liability occur. See, e. g., United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); Lucas v. American Code Co., 280 U.S. 445,

50 S.Ct. 202, 74 L.Ed. 538 (1930); Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934); Clevite Corp. v. United States, 181 Ct.Cl. 652, 386 F.2d 841 (1967); Int.Rev.Code of 1954, § 461; Treas.Reg. § 1.461–1(a).

Defendant argues that any non-vested portion of the accrual may never actually be paid, because it is theoretically possible, given a sufficiently high turn-over in dealers, for no dealer ever to get a vested right in more than 70 percent of the amount credited to his account. This view rests on defendant's contention that what we have here is a series of unilateral offers to individual dealers, and that viewed singly, no one "offer" ever becomes a liability to the Post except to the extent it results in "acceptance" so as to vest a certain percentage of the offeree's account in the offeree. In the alternative, defendant claims that if there is a liability to a group, that liability is never definite enough (except to the extent that individual members have vested rights in the Fund) to be "fixed" under the "all events" test, because the group is capable of constant change, and neither the ultimate recipients of the Fund, nor the time of distribution can be ascertained in the year of accrual.

We think that neither of these theories adequately takes account of the one overriding reality in this case: plaintiff is irrevocably bound to pay whatever it accrues to the Fund, and this amount is definitely fixed as of the time of accrual. Unless the accrual does not fairly reflect income of the taxable year (Int.Rev.Code of 1954 § 461, and Treasury Regulations thereunder) because the accrual represents an expense not properly attributable to the year of accrual (see Part II, infra, for a discussion of this point), we think nothing remains to occur under the Plan before plaintiff's liability attaches, once it has accrued a fixed amount on its books.

It is misleading to look at this Plan as a series of unilateral offers, precisely because the Plan is designed to bind each dealer to the group, whose collec-tive effort is the criterion for awarding the yearly dealers' share of profits to the Fund. The Plan is also designed to bind the dealers to the Post, by "penalizing" each dealer who drops out before all of his account vests. Thus, a premium is placed on group success, and on staying with the group as a dealer, if for no other reason, because the longer a dealer stays, the more chance he has to share in the "forfeitures" of dealers who abandon their dealerships. While it is analytically possible to view each dealer's relationship with the Post separately, the whole import of the Plan is, both from the Post's point of view and that of the dealers', to develop a cohesive and continuing group of dealers on whom the Post can rely.

So we view this Plan for what it functionally is: a continuing liability on the part of the Post to compensate a group of dealers, the amount of compensation being fixed as of the end of each fiscal year, but the ultimate recipients, and the time of actual payout, undetermined, at least in part. We think the indeterminacy involved does not make the liability any less real, or any less fixed. No problem of estimating the amount of the expense is involved here, so this case certainly is not comparable to the cases involving accruals to "contingency" accounts. Cf. e. g., Clevite Corp. v. United States, supra. In situations somewhat comparable to this, other courts have held that indeterminacy at the time of accrual as to the ultimate recipient's exact share of accrued "bonuses," or indeterminacy as to the time of payout, does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed. See Willoughby Camera Stores v. Comm'r, 125 F.2d 607 (2d Cir. 1942); Kershaw Mfg. Co. v. Comm'r, 313 F.2d 942 (5th Cir. 1963); Avco Mfg. Corp., 25 T.C. 975, 1000–1001 (1956) acq. 1957–1 Cum.Bull. 3; Rath Packing Co. v. Bacon, 255 F.Supp. 809 (S.D.Iowa 1966). We recognize that these cases are perhaps not on all fours with the present case, because in each

either the payout time would almost certainly have to occur within an ascertainable number of years, or the payees would be ascertained within such a period. Nevertheless, we think the principle announced in the cited cases is identical to the one we follow here: when a "group liability" is involved, it is the certainty of the liability which is of utmost importance in the "all events" test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees.

■ Indeed, some decisions have allowed accrual of expenses where it is uncertain that payment will ever be made, so long as the liability is fixed in amount. Thus, in Clark v. Woodward Constr. Co., 179 F.2d 176 (10th Cir. 1950), corporate officers' salaries were accrued in 1939, but because of the corporation's financial difficulties, the salaries were only partly paid that year, the balance to be paid "when the finances of the Company will warrant." There, it was not fatal to accruability that there seemed to be a real possibility that such salaries might never be paid —or might be paid only at an indefinite future time. See also Keebey's, Inc. v. Paschal, 188 F.2d 113 (8th Cir. 1951). In United Control Corp., 38 T.C. 957 (1962), accrual of officers' salaries was permitted, although the salaries were in part specifically not payable until other liabilities of the corporation had been discharged. In that case, the government apparently argued, as it does here, that the deduction should not be allowed

because of the uncertainty that the accrued liabilities would ever be paid. However, the court decided that there was an absolutely fixed liability, just as there is here, which was reasonably certain to be paid, although the exact time of payment was undetermined. We think the message is clear: the "all-events" test that comes down to us from United States v. Anderson, supra, is not inflexible; when the liability itself is clearly fixed, as in this case, other uncertainties do not necessarily destroy that initial certainty.

II

■ The final question in this case turns on whether or not the amounts accrued in each of the years in question are properly allocable to those years so as to clearly reflect income. It goes without saying that this court is not now approving the practice of simply setting up accrued, fixed liabilities (thus satisfying the "all events" test) which bear absolutely no relationship to income for the current tax year. But that is not the case at bar. We think the plaintiff is correct when it argues that the amounts accrued are deductible as circulation expenses under Section 173 of the Internal Revenue Code of 1954.[1] Certainly the dealers have no other function but to "establish, maintain, or increase the circulation" of the Post. It is stipulated that the Post's profits are attributable in large measure to volume of newspaper sales; it is further agreed that the dealers are the crucial link between the Post and its subscribers, and

---

1. Section 173 reads in pertinent part as follows:

"SEC. 173. CIRCULATING EXPENDITURES.

"Notwithstanding section 263, all expenditures (other than expenditures for the purchase of land or depreciable property or for the acquisition of circulation through the purchase of any part of the business of another publisher of a newspaper, magazine, or other periodical) to establish, maintain, or increase the circulation of a newspaper, magazine, or other periodical shall be allowed as a deduction; * * *."

Treas. Reg. 1.173–1 reads in pertinent part as follows:

"Sec. 1.173–1 *Circulation expenditures.*

"(a) Allowance of deduction. Section 173 provides for the deduction from gross income of all expenditures to establish, maintain, or increase the ciculation of a newspaper, magazine, or other periodical, subject to the following limitations:

\*    \*    \*    \*    \*

"(3) The deduction shall be allowed only for the taxable year in which such expenditures are paid or incurred * * *."

that the volume of papers sold is dependent largely on the dealers. As we have already noted, the entire purpose of the Plan is to keep an experienced, interested group of dealers affiliated with the Post. The government has made no allegations that this Plan is an unreasonable means of achieving that goal, nor does the government contend that the goal itself is unnecessary to the Post's circulation.

Indeed, it would seem highly unlikely that the Post would long continue the Plan if the operation did not prove successful in maintaining dealer loyalty and interest. We note that during the period involved in this litigation, the "drop-out" rate of dealers has been quite small (less than 15 out of a dealership which always exceeded 115 members), while the total number of dealers has increased by over 15. We can reasonably assume that the Plan has had an effect on these statistics.

Thus, we do not have here a situation where there is a very high dealership turnover every year for several years, with an extraordinary number of "forfeitures" under the Plan. If that were true, it might indicate that the Plan itself bears little relationship to its claimed justification of promoting circulation through dealer continuity and incentive. We do not decide whether in such circumstances a newspaper would be entitled to a deduction under section 173.

Because we have premised the deduction of the amounts accrued to the Plan on our finding that this deduction is justified under section 173, we need not reach the question whether plaintiff would also be entitled to this deduction under section 162,[2] although no attempt has been made to show that as to any one dealer, the amount he may receive

under the Fund (including his share of "forfeitures") is "reasonable." Cf. Botany Worsted Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379 (1929); R. J. Reynolds Tobacco Co. v. United States, 138 Ct.Cl. 1, 149 F.Supp. 889 cert. denied, 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957).

For the foregoing reasons, defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted. Therefore, judgment is entered for plaintiff in the amount of one hundred forty-two thousand nine hundred twelve dollars and twenty-five cents ($142,912.25), plus interest as provided by law.

---

2. Section 162 of the Internal Revenue Code of 1954 reads in pertinent part as follows:
"SEC. 162. TRADE OR BUSINESS EXPENSES.
"(a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
"(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;"
\*    \*    \*    \*    \*