BENNETT PAPER CORPORATION AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9854–78. Filed March 29, 1982.

*Donald H. Whaley,* for the petitioners.
*William J. Falk,* for the respondent.

WILES, *Judge*: Respondent determined a deficiency of $93,895 in petitioners' 1974 Federal income tax. After concessions, the issues for decision are:

(1) Whether certain preopening expenditures claimed on

---

petitioners' consolidated return were incurred in the course of a trade or business under section 162(a).[1]

(2) Whether petitioners are entitled to a deduction in excess of the amount allowed by respondent for a liability incurred under a profit sharing plan.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners maintained their principal places of business in Maryland Heights, Mo., at the time the petition in this case was filed. For petitioners' 1974 taxable year, they filed a consolidated return. Among the corporations which were listed on the return as members of the affiliated group were Bennett Paper Corp., Commodores International Yacht Club, Inc., Concepts, Inc., and Maryland Heights Leasing, Inc.

Bennett Paper Corp. (hereinafter petitioner) was incorporated in 1956, and is authorized to do business under the laws of the State of Missouri. Petitioner manufactures corrugated boxes and various paper packaging products. Petitioner's president is Samuel F. Bennett (hereinafter Mr. Bennett), who also is the president of some of petitioner's subsidiaries.

## Activities of Petitioner's Subsidiaries

Two of petitioner's subsidiaries are Maryland Heights Leasing, Inc. (hereinafter MHL), and Concepts, Inc. (hereinafter Concepts). Both MHL and Concepts are Missouri corporations which were formed in 1960 and 1973, respectively. Petitioner owns directly all of Concepts' stock. Petitioner owns directly 93 percent of MHL's stock; the remaining 7 percent of MHL's stock is owned by Mr. Bennett's mother. On July 16, 1973, MHL formed King Island, Inc. (hereinafter KI), a Florida corporation, to operate a marina business. MHL owned 95 percent of KI's stock; the remaining 5 percent of KI's stock was owned by Mr. Bennett's accountant, Bernard Stock.

In August of 1973, KI purchased a marina facility from Williams Marine Lodge, Inc. The purchase price consisted of $75,000 cash and a $300,000 purchase money mortgage on the

---

[1]All statutory references are to the Internal Revenue Code of 1954 as amended.

property. No person other than KI signed the mortgage note or was liable to make any payments on it. In operating the marina business it had purchased, KI used the trade name of "Pirate's Cove Marina" (hereinafter Pirate's Cove) and offered the following services: sale, repair, and storage of boats, and the sale of gas and marine supplies. From the start, Pirate's Cove was an unprofitable venture for KI, largely because the marina was located on a creek which was filled with silt. The silt prevented the marina from getting its customers' boats in and out of the water, except at high tide.

Early in 1974, KI planned to start a yacht club at Pirate's Cove in addition to operating its marina business. The plan called for the yacht club to buy sailboats and power boats of various sizes and to make these boats available to club members; anyone interested in enjoying the benefits of the yacht club could apply for club membership and, if accepted, pay a membership fee of $500. It was also proposed that a member of the yacht club would pay a $40 monthly membership fee and a rental fee each time that he used one of the club's boats.

KI never opened up a yacht club at Pirate's Cove, and by August 1974, KI decided to sell the marina. In August 1974, petitioner considered the possibility of KI's establishing a marina and yacht club venture at another location, but petitioner did not want the venture to be saddled with KI's $300,000 mortgage liability.[2] Consequently, on August 27, 1974, Concepts created a wholly owned subsidiary, the Commodores International Yacht Club, Inc. (hereinafter CIYC), a Florida corporation, to establish a marina and yacht club.

In September and October 1974, CIYC entered into leases of certain raw unimproved land with water rights. CIYC originally planned to operate a marina and yacht club on the leased premises, and it set up a temporary office thereon to sell memberships in the proposed yacht club. CIYC soon realized, however, that it would be less costly to purchase an existing marina facility rather than to build one on the unimproved leased property. As a result, CIYC decided to attempt to

---

[2]In October 1974, KI sold all of its assets, but it maintained its legal existence until approximately September 1975.

purchase an existing marina facility, and it never established a marina or yacht club on the leased premises.

By the end of 1974, CIYC had not yet purchased a marina; however, it had collected approximately $5,000 in application fees from persons interested in becoming members of its proposed yacht club. On CIYC's books, it recorded these application fees as liabilities because it was obligated to refund the moneys if the yacht club never began operation. As of December 31, 1974, CIYC recorded no gross receipts of any kind; it had neither yacht club members nor the facilities, boats, and other equipment needed to operate a yacht club; it neither owned nor operated a marina facility; it did not own any depreciable property; and it did not have reciprocal membership privileges with other marinas or yacht clubs.

In March 1975, CIYC purchased an existing marina facility known as the Caladesi Cay Marina (hereinafter Caladesi Cay), which was adjacent to the property that CIYC had leased in September and October of 1974. CIYC immediately began operating the marina at Caladesi Cay. On June 1, 1975, CIYC held the grand opening of its yacht club at Caladesi Cay, and first made boats available for rental on June 16, 1975.

On petitioners' consolidated return for 1974, a deduction of $57,870 was claimed for business expenses incurred by CIYC during such year. In the notice of deficiency, respondent determined that the claimed $57,870 business deduction represented nondeductible preopening expenses, which were required to be capitalized.

### Employee Bonus Plan

Throughout 1974, petitioner employed an accrual basis of accounting and had a profit sharing plan (hereinafter the plan) in effect for its salaried employees. The amount of profit sharing that an employee would receive was dependent upon his salary and petitioner's quarterly and annual profits. Petitioner's plan provided, in pertinent part, the following:

I. REQUIREMENTS:

(a) [Those eligible] Must be an employee of the Company for the entire quarter.

(b) [Those eligible] Must be an employee of the Company at time of payment of bonus.

(c) The combined income of Bennett Paper and its applicable subsidiaries

must be in excess of three (3) percent on gross sales for the quarter. Quarters due on a calendar basis, ending March 31, June 30, September 30 and December 31.

II. METHOD OF PAYMENT:

(a) The quarter's profit sharing will be determined from the operating statement as prepared from the records of the Accounting Department. *All profits are determined on a before tax basis.*

(b) Fifty (50) percent of the calculated profit sharing will be paid in the month following the end of the quarter.

(c) The second half of the calculated profit sharing will be paid if the company maintains a minimum return of four (4) percent on gross sales for the entire calendar year. The percent of return will exclude all previous payments and accruals of calculated profit sharing.

(d) If the company achieves a rate of return on gross sales in excess of four (4) percent, then the second half of the calculated profit sharing will be paid as follows:

1. Twenty-five (25) percent of the total profit sharing to be paid in April, along with the following year's first quarter profit sharing.

2. The remaining twenty-five (25) percent to be paid in July, along with the following year's second quarter profit sharing.

III. METHOD OF CALCULATING PROFIT SHARING FOR THE QUARTER:

(a) Determine gross sales for the quarter.

(b) Divide operating profit by gross sales.

(c) On profits in excess of the three (3) percent, you earn one (1) percent for each one fourth (1/4) percent of profit.

```
[Example]
Sales for quarter ....................................... $850,000
Profit for quarter ......................................   59,500
Percent of return on sales ..........................      7%
Less ......................................................      3%
Net balance for profit sharing ......................      4%
Multiply by ..............................................      4
Equals percentage for calculated
  profit sharing ........................................     16%
```

The total base salary paid during the quarter is then multiplied by the 16%.

| *Earnings for quarter* | *Percentage* | *Total* | *Paid* | *Withheld* |
|---|---|---|---|---|
| $2,000 | 16% | $320 | $160 | $160 |

As of December 31, 1974, petitioner determined that its employees earned $364,274.06 in bonuses during 1974. The plan required petitioner to pay $181,650.01 of this $364,274.06 in April and July of 1975, but only if the employees who

earned the bonuses were still employed by petitioner at such times. Nevertheless, petitioner accrued the $181,650.01 as a liability that it incurred in 1974, and such amount was deducted on petitioners' consolidated return for 1974. In the notice of deficiency, respondent determined that $129,476 of the claimed $181,650.01 deduction for accrued bonuses was not a fixed liability in 1974, and, therefore, disallowed such portion of the claimed deduction.[3]

## OPINION

### Issue 1. Carrying on a Trade or Business

Section 162(a) provides that a taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year "in carrying on any trade or business." This trade or business requirement denies a taxpayer deductions for preopening costs until actual business operations are commenced and the taxpayer performs those activities for which it was organized. *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 566–567 (1979), affd. 633 F.2d 512 (7th Cir. 1980); *Goodwin v. Commissioner*, 75 T.C. 424, 433 (1980); *Downs v. Commissioner*, 49 T.C. 533, 540 (1968); *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803, 812 (1959); *Polachek v. Commissioner*, 22 T.C. 858, 863 (1954). In the instant case, respondent maintains that he disallowed the claimed deduction for preopening expenses because CIYC was not carrying on a trade or business at the time such expenses were incurred.

Petitioners argue that since they filed a consolidated return, the marina activities of KI may be attributed to CIYC in determining whether CIYC was carrying on a trade or business when it incurred the preopening expenses at issue. Essentially, petitioners maintain that the formation of CIYC did not constitute a new business venture, but rather a continuation of its predecessor's (KI's) marina operation with an additional marketing concept (the yacht club). Thus,

---

[3]Respondent did not explain why he allowed $52,174.01 of the claimed $181,650.01 deduction.

petitioners contend that the preopening expenses which CIYC incurred in 1974 were properly deductible in such year under section 162(a). Respondent maintains, however, that KI and CIYC were formed as separate corporate entities and should be recognized as such for tax purposes. Consequently, respondent's position is that it is inappropriate to look beyond CIYC's own activities in determining whether it was carrying on a trade or business.

Underlying respondent's position is his claim that CIYC was formed for bona fide business purposes and was not a sham corporation. Respondent maintains that the mere filing of a consolidated return is not a sufficient basis for imputing KI's activities to CIYC. With respect to the recognition or nonrecognition of corporate entities, the Supreme Court in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438–439 (1943), stated:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. *New Colonial Co. v. Helvering*, 292 U.S. 435 * * * ; *Deputy v. du Pont*, 308 U.S. 488 * * *
>
> To this rule there are recognized exceptions. *Southern Pacific Co. v. Lowe*, 247 U.S. 330 * * * , and *Gulf Oil Corp. v. Lewellyn*, 248 U.S. 71 * * * , have been recognized as such exceptions but held to lay down no rule for tax purposes. *New Colonial Co. v. Helvering, supra*, 292 U.S. 442, * * * ; *Burnet v. Commonwealth Imp. Co., supra*, 420, * * * In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. *Higgins v. Smith*, 308 U.S. 473 * * * ; *Gregory v. Helvering*, 293 U.S. 465 * * * [Fn. refs. omitted.]

The exceptional cases where the courts have disregarded corporate lines between parent and subsidiary corporations have generally involved extraordinary or "peculiar" circumstances where disregarding the corporate lines was done to arrive at a "just taxing basis." *North Jersey Title Ins. Co. v. Commissioner*, 84 F.2d 898, 901 (3d Cir. 1936); *Continental Oil Co. v. Jones*, 113 F.2d 557 (10th Cir. 1940); *Gulf Oil Corp. v. Lewellyn*, 248 U.S. 71 (1918); *Southern Pacific Co. v. Lowe*, 247 U.S. 330 (1918); *Baltimore Aircoil Co. v. United States*, 333 F. Supp. 705 (D. Md. 1971). In the instant case, petitioners have

not pointed to any extraordinary or peculiar circumstances for disregarding CIYC as a separate corporate entity. CIYC was formed because petitioner did not want the planned marina and yacht club to be saddled with the debt that KI had incurred when it purchased Pirate's Cove. The use of a new corporate entity to avoid the demands of creditors of other members of the affiliated group is a valid business purpose, and since CIYC was intended to, and did, in fact, act in its own name with respect to the marina property, this use requires recognition of CIYC as a separate entity. *Moline Properties, Inc. v. Commissioner, supra* at 438, 439. See also *Collins v. United States*, 514 F.2d 1282, 1283 (5th Cir. 1975), affg. per curiam 386 F. Supp. 17 (S.D. Ga. 1974); *Elot H. Raffety Farms, Inc. v. United States*, 511 F.2d 1234, 1238–1239 (8th Cir. 1975); *Coca-Cola Bottling Co. of Gallup v. United States*, 443 F.2d 1253, 1254 (10th Cir. 1971). In seeking to attribute KI's activities, but not its debt, to CIYC, petitioners want CIYC to have the advantages of incorporation, but not any of the corresponding tax consequences of being a separate jural entity. This position is inconsistent with the well established principle that to attain the advantages of incorporation, any corresponding tax disadvantages must be accepted. *Burnet v. Commonwealth Improvement Co.*, 287 U.S. 415 (1932).

Recent decisions by this Court have specifically considered and rejected petitioner's position that the trade or business requirement of section 162(a) can be satisfied by attributing trade or business activities of one entity to another. In *Madison Gas & Electric Co. v. Commissioner, supra*, three public utilities in the business of producing electricity formed a joint venture for the purpose of building and operating a nuclear power plant. For tax purposes, the joint venture was treated as a partnership. The issue was whether one of the partners, M, could deduct its distributive share of certain employee training expenses incurred during construction of the plant, but prior to the issuance of an operating permit by the Nuclear Regulatory Commission. The Commissioner disallowed the deduction, maintaining that the employee training expenditures constituted preopening expenses of the partnership, which were incurred prior to the carrying on of a trade or business by the partnership. M argued that the activities of the partners should be imputed to the partnership, thus

making the training costs continuing expenses of the partners in their business of producing electricity. We held that the trade or business requirement of section 162(a) must be applied at the partnership level, without regard to the business of the individual partners.

In *Goodwin v. Commissioner, supra,* we were once again faced with the issue of whether the business activities of one entity are relevant in determining whether another entity's expenses were incurred while carrying on a trade or business. In *Goodwin,* G was a partner in two limited partnerships which were formed to construct housing projects. Prior to becoming a partner, G had been engaged in various activities in the real estate development business. In order to arrange financing for the housing projects, the partnerships incurred expenses for certain loan and mortgage brokerage fees in 1972. The housing projects were neither completed nor leased to tenants until after 1972. On G's 1972 income tax return, he deducted his distributive share of these expenses. The Commissioner disallowed these deductions on the basis that they were incurred before the partnerships were engaged in a trade or business under section 162(a). G argued that the partnership entities should be disregarded and that his activities as a partner represented nothing more than a continuation of his prior activities in the real estate development business. In finding for the Commissioner, we followed our decision in *Madison Gas* and held that the trade or business requirement of section 162(a) must be applied at the partnership level without regard to the businesses of the partners. See generally *Podell v. Commissioner,* 55 T.C. 429 (1970).

Our decisions in *Madison Gas* and *Goodwin* are in line with other cases which have generally rejected the attribution of trade or business activities of one entity to another. For example, in *Whipple v. Commissioner,* 373 U.S. 193, 202 (1963), rehearing denied, 374 U.S. 858 (1963), the Court held that a corporation's trade or business activities were not relevant in determining whether an individual stockholder was engaged in a trade or business, and thus able to attain favorable tax treatment with respect to a bad debt. See also *Deputy v. du Pont,* 308 U.S. 488, 494 (1940); *Burnet v. Clark,* 287 U.S. 410 (1932); *Dalton v. Bowers,* 287 U.S. 404 (1932). Consequently, in the instant case, we believe that in order for the preopening

expenses to be deductible, CIYC must satisfy the trade or business requirement by its own activities.

Our decision to consider only CIYC's activities in determining whether CIYC satisfied the carrying on requirement of section 162(a) is further supported by the regulations governing consolidated returns. Section 1.1502–11(a), Income Tax Regs., provides that the "consolidated return year shall be determined by taking into account—(1) the separate taxable income of each member of the group (see section 1.1502–12 for the computation of separate taxable income)." Section 1.1502–12, Income Tax Regs., provides with exceptions not relevant herein, that the "separate taxable income of a member of a group shall be computed in accordance with the provisions [of the Code] covering the determination of taxable income of separate corporations." It necessarily follows from these regulations that a member of an affiliated group must satisfy the trade or business requirement by its own activities in order to be allowed a deduction under section 162(a).

Petitioners rely primarily on *Playboy Clubs International, Inc. v. United States*, an unreported case (N.D. Ill. 1976, 37 AFTR 2d 76–1304, 76–2 USTC par. 9560), affd. in part, vacated in part, and remanded in part in unpublished order (7th Cir., May 16, 1977), for their position that CIYC's preopening expenses were properly deductible. We find that *Playboy* is distinguishable and, therefore, disagree with petitioners.

In *Playboy*, the plaintiff parent corporation (hereinafter the plaintiff), sought summary judgment on whether certain preopening expenses of its wholly owned subsidiaries could be deducted under section 162(a) as ordinary and necessary expenses paid or incurred in carrying on a trade or business. During the course of three fiscal years, the plaintiff incorporated several new subsidiaries to operate clubs which would provide food, drink, and entertainment to their members. The plaintiff and its new subsidiaries actively began soliciting members from the local area of each club. Even though the newly created subsidiaries had not yet opened their clubs to their members, the club members enjoyed reciprocal membership privileges at Playboy Clubs throughout the United States. During the years in question, the plaintiff and its subsidiaries filed consolidated tax returns that included in income the

amounts received from selling memberships in the newly created subsidiaries.

In *Playboy*, the U.S. District Court held that certain expenses incurred by the plaintiff's newly created subsidiaries prior to the dates that they opened their clubs to their members, would be properly deductible under section 162(a). In so finding, the District Court was influenced by the following facts: the newly created subsidiaries were all formed to engage in the same business enterprise as the parent corporation, the operation of entertainment clubs; some of the clubs were already operating and members enjoyed reciprocal membership privileges at Playboy Clubs throughout the United States; the newly created subsidiaries collected membership fees which were required to be reported as income on the consolidated returns.

All of the facts which influenced the District Court in *Playboy*, however, are conspicuously absent in the instant case. Unlike the *Playboy* case, petitioners have not established that they have all been engaged in the same business enterprise. Cf. *Baltimore Aircoil Co. v. United States, supra* (preopening expenses of a wholly owned subsidiary held deductible when the parent corporation is engaged in the same business enterprise); see generally *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir. 1974); *Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775 (2d Cir. 1973), revg. a Memorandum Opinion of this Court (expansion of business enterprise within an existing corporate structure). Furthermore, although KI began operating a marina business in 1973, it never owned any stock in CIYC, a fact which distinguishes the instant case from *Playboy Clubs International, Inc. v. United States, supra,* and *Baltimore Aircoil Co. v. United States, supra.* Notwithstanding that KI and CIYC were members of an affiliated group which filed a consolidated return, petitioners have not cited any case where a subsidiary corporation (i.e., CIYC) was found to be carrying on a trade or business merely because one of several corporations in the affiliated group (i.e., KI) was previously engaged in a similar business enterprise.

The instant case also differs from *Playboy* in the following ways. Petitioners never substantiated that CIYC's proposed yacht club had any members in 1974, although CIYC did

establish that approximately $5,000 in application fees was received from persons seeking club membership. Moreover, unlike the facts in *Playboy*, a membership in CIYC's proposed yacht club did not include a right to enjoy membership privileges in any existing clubs. Furthermore, in *Playboy* the membership fees were reported as income on the consolidated returns, but, in the instant case, the $5,000 in application fees was not reported as income on petitioners' consolidated return for 1974. Instead, these application fees were treated as liabilities of CIYC, because CIYC had to return the moneys in the event that it never opened a yacht club. We think that CIYC's characterization of the application fees as liabilities is indicative of its own uncertainty as to when, if ever, it would commence business operations.[4] For the foregoing reasons, we find the facts in *Playboy* to be clearly distinguishable and, accordingly, we decline to apply its rationale to the instant case.

Petitioners argue that even if KI's activities are not attributable to CIYC, CIYC was carrying on a trade or business when it incurred the preopening expenses in 1974. We disagree. The leading case of *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965), after reviewing many of the cases which considered the carrying on requirement, stated:

> The uniform teaching of these several cases is that, even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized. [Fn. ref. omitted.]

See also *Downs v. Commissioner*, 49 T.C. 533, 540 (1968) (expenditures preparatory to entering a trade or business are not deductible under section 162).

In light of the foregoing, we hold that CIYC was not carrying on a trade or business in 1974. Prior to CIYC's acquisition of Caladesi Cay in 1975, CIYC was in no position to carry out its intended business purpose, to operate a marina and yacht

---

[4]Since respondent has not argued that CIYC should have characterized the application fees it received as income, we express no opinion on the matter.

club. As of December 31, 1974, CIYC had none of the following: ownership or use of a marina facility; yacht club members or the boats and equipment to operate such a club; reported gross receipts or depreciable property of any kind; reciprocal membership privileges with other yacht clubs. During 1974, CIYC's only activities related to preparations for entering the marina and yacht club business. In fact, as late as December 31, 1974, CIYC was still uncertain as to when, if ever, it would be operating a marina and yacht club. Consequently, we uphold respondent's determination that the preopening expenses which CIYC incurred were not properly deductible on petitioners' consolidated return for 1974.

## Issue 2. Employee Bonus Plan

We must determine whether or not the amounts that petitioner accrued on its books as contributions to its plan are deductible in excess of the amount allowed by respondent.

Petitioner was using the accrual method of accounting during the taxable year in issue. An accrual basis taxpayer may deduct an expense for the taxable year in which all events have occurred which determine the fact of the liability and which fix the amount of such liability with reasonable certainty. *United States v. Anderson*, 269 U.S. 422, 441 (1926); *Putoma Corp. v. Commissioner*, 601 F.2d 734, 738 (5th Cir. 1979), affg. 66 T.C. 652 (1976); *Clevite Corp. v. United States*, 181 Ct. Cl. 652, 658, 386 F.2d 841, 843 (1967); *Denver & Rio Grande Western Railroad Co. v. Commissioner*, 38 T.C. 557, 572 (1962); sec. 1.461–1(a)(2), Income Tax Regs. It is well settled that a liability which is uncertain, or contingent, may not be accrued and deducted until the year that it becomes certain, and no longer contingent. *Security Flour Mills Co. v. Commissioner*, 321 U.S. 281 (1944); *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516 (1944); *Brown v. Helvering*, 291 U.S. 193 (1934); *Putoma Corp. v. Commissioner, supra*; *Union Pacific R.R. Co. v. United States*, 208 Ct. Cl. 1, 524 F.2d 1343 (1975); *Scott Paper Co. v. Commissioner*, 74 T.C. 137, 165 (1980).

Upon reviewing the terms of the plan, we hold that petitioner's liability was not fixed at the year's end. Any employee who failed to survive or remain in petitioner's employ until April and July of 1975 would forfeit a portion of the 1974 bonus. Since all such forfeitures reverted back to

petitioner, the extent of petitioner's liability under the plan was not fixed at the end of 1974. Thus, the instant case does not involve a situation where petitioner had a fixed liability to an employee group on December 31, 1974, with the only uncertainty at that date being the specific individuals who made up such group. See *Washington Post Co. v. United States*, 186 Ct. Cl. 528, 405 F.2d 1279, 1283–1284 (1969); *Produce Reporter Co. v. Commissioner*, 18 T.C. 69 (1952), affd. on another issue 207 F.2d 586 (7th Cir. 1953).

Since we have found that petitioner's liability to pay the employee bonus amounts was not fixed by December 31, 1974, it is not entitled to accrue and deduct such amounts which respondent disallowed for 1974.

To reflect the foregoing,

*Decision will be entered for the respondent.*