CARLOS E. SCOTT and TAMSIN J. SCOTT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TERENCE C. PORTER and JOYCE N. PORTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scott v. Commissioner
Docket Nos. 20422-80, 20423-80
United States Tax Court
T.C. Memo 1983-550; 1983 Tax Ct. Memo LEXIS 242; 46 T.C.M. (CCH) 1324; T.C.M. (RIA) 83550; September 7, 1983. Terence C. Porter, for the petitioners. Donald L. Wells, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: *243 Respondent determined the following deficiencies in petitioners Carlos E. Scott and Tasmin J. Scott's income taxes in docket No. 20422-80: Taxable
Year
Deficiency
1970
$1,569.93
1973
1,323.80
1974
4,080.60
1975
9,891.00
Respondent determined the following deficiencies in and additions to petitioners Terence C. Porter and Joyce N. Porter's income taxes in docket No. 20423-80: Taxable
Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
1973
$4,371.49
$1,092.88
1974
8,498.00
1,672.00
1975
21,242.00
The questions for our determination in these consolidated cases are whether Stadium Boulevard Company, an electing Subchapter S corporation, lost its tax option election in 1974 through the receipt of too much interest income, and whether it was entitled to deduct certain expenses in calculating its distributable income for 1973. Because the primary issue in this case is a factual determination, it is necessary to recite the facts in detail. FINDINGS OF FACT Some of the *244 facts have been stipulated and the stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners Carlos E. Scott and Tamsin J. Scott, husband and wife, resided in Columbia, Missouri, during the years in issue and when they filed their petition in docket No. 20422-80. Petitioners Terence C. Porter and Joyce N. Porter, husband and wife, also resided in Columbia, Missouri, during the years in issue and when they filed their petition in docket No. 20423-80. Reference hereinafter to "petitioners" will be to Messrs. Scott and Porter. On July 7, 1971, petitioners and a third person, Paul A. Medley, executed articles of incorporation for Boone County Development Company (Boone). Also on July 7, 1971, Boone, through Mr. Scott and Mr. Porter, signed an agreement to purchase a 45-acre tract of land at the intersection of Interstate 70 and Stadium Boulevard in Columbia, Missouri, from Charles and Fern Leslie for $250,000. Boone took title to the 45 acres on September 28, 1971. The purchase was financed in part by the First National Bank and Trust Company (First National), which lent $95,000 to Boone on September 29, 1971. The loan was secured by *245 a deed of trust on the 45 acres. First National lent Boone another $10,000 on December 22, 1971. During 1972, First National made several additional loans to Boone that totaled $102,500, including accrued interest, and left an outstanding balance owing of $207,500 as of November 21, 1972. On October 16, 1972, a Certificate of Incorporation was issued for Hilton Inn of Columbia, Inc., a corporation also formed by Messrs. Porter, Scott, and Medley. The name of this corporation was subsequently changed to Stadium Boulevard Company (Stadium). Also on October 16, 1972, Stadium filed an election to be taxed under the provisions of Subchapter S. On December 28, 1972, Boone distributed a 7.1-acre (the "Hilton property") portion of the 45-acre tract to Messrs. Porter, Scott, and Medley, who then contributed it to Stadium on the following day. On January 11, 1973, Boone made an interest payment of $400 to First National. Stadium received a 20-year nonassignable license and franchise to operate the Hilton Inn on March 1, 1973; construction began shortly thereafter. Stadium arranged to obtain construction financing from Republic Realty Mortgage Company (Republic), and St. Paul Title *246 Insurance Corporation (St. Paul) agreed to act as the disbursing agent for the loan. Because Republic would lend only $1.6 million and the cost of the project had been estimated to be slightly in excess of $1.9 million, St. Paul directed Stadium to obtain additional financing or an irrevocable letter of credit for the difference, approximately $310,000. On March 21, 1973, Mr. Porter wrote to Richard Hutchens, president of First National, and explained that the anticipated cost of the Hilton project exceeded by $310,609 the amount of financing obtained by Stadium. He then requested the bank to issue a letter of credit in that amount and to release its lien on the Hilton property in exchange for full repayment to the bank of all the funds previously lent to Boone. First National was unable to make the loan, and Mr. Hutchens suggested approaching Tower Grove Bank of St. Louis (Tower Grove), a correspondent bank. In April 1973, Mr. Hutchens and Mr. Porter met with Donald R. Potthast, a loan officer for Tower Grove. Mr. Potthast told Mr. Porter that Tower Grove would require security for an irrevocable letter of credit. A lien on the property owned by Boone was the suggested collateral; *247 the request for the letter of credit in the amount of $314,982 was then approved by the bank's loan committee on April 12, 1973. On April 30, 1973, Messrs. Porter, Scott, and Medley, as the directors of Boone, executed a corporate resolution authorizing the president of Boone to execute a note for $315,000 [2] and a deed of trust on the land still owned by Boone to secure the "loan to Stadium Boulevard Company." Simultaneously, Boone issued a deed of trust for the 45 acres, less the Hilton property, and a promissory note for $315,000 to Tower Grove. On May 3, 1973, checks payable to First National totaling $238,016.60 were drawn on an account in the name of Stadium maintained with First National; on the same day a new loan to Boone for $275,000 was made by that bank. First National then released its lien on the Hilton property and eventually subordinated its lien on the rest of the property to Tower Grove's lien. On June 8, 1973, a construction financing agreement for $1.6 million was executed by Republic, as "lender," and Stadium, as "borrower." Messrs. Scott, Porter, and *248 Medley and their wives signed an addendum to the agreement that guaranteed performance by Stadium. Republic, Stadium, and R.K.&A. Jones, Inc., the contractor on the Hilton construction project, then entered a construction and disbursing escrow agreement. St. Paul was designated as the "escrowee" and Stadium was designated as the "owner." One of Stadium's duties under the agreement was to provide the funds to be disbursed by the escrowee for construction and other related costs of the Hilton. Any funds remaining with St. Paul after the project was completed were to be returned to Stadium. The owner's "equity requirement," of $314,982, was satisfied by the letter of credit. On August 28, 1973, a note for $315,000 payable to Tower Grove was made by Stadium. That note was guaranteed by Boone's note and deed of trust. That same day, an irrevocable letter of credit for $315,000 was issued by Tower Grove to St. Paul. A fee of 1-1/2 percent of the amount of the credit -- $4,750 -- was paid by Stadium to Tower Grove. The letter was delivered to St. Paul with the instructions that all drafts drawn under the letter were to bear the clause "Drawn under the Tower Grove Bank and Trust *249 Company Letter of Credit, dated August 28, 1973, Stadium Boulevard Company." On May 23, 1974, St. Paul requested the transfer of $315,000 from Tower Grove, pursuant to the terms of the letter of credit. Tower Grove charged a 1 percent fee -- $3,150 -- for funding the letter, which was paid by Stadium on May 28, 1974. On June 3, 1974, St. Paul invested $200,000 of the funds from Tower Grove in a certificate of deposit with Mercantile Trust Company, St. Louis, Missouri. As a result of that investment, Mercantile paid interest of $5,924.83 to St. Paul, who in turn issued a check in that amount to Stadium on November 27, 1974. St. Paul also issued to Stadium a Form 1087-INT reporting 1974 interest earned by Stadium in the amount of $5,924.83 Stadium made several interest payments to Tower Grove in 1974 in addition to the 1 percent fee mentioned above. These payments included $7,008.75 paid on August 29, 1974; $2,441.25 paid on October 15, 1974; and $2,362.50 paid on November 15, 1974. All of the interest payments made by Stadium to Tower Grove in 1974 related to the funds advanced under the letter of credit. A general strike in the construction industry in Columbia caused delays *250 in the completion of the hotel and the Hilton Inn did not open for business until April 10, 1975. On August 13, 1975, Boone sold approximately 2.25 acres of the original 45-acre tract to Adolph Hanser, and Boone reported a gross sales price of $258,954 on its 1975 return. Tower Grove received $101,498.75 of the proceeds of the sale; $80,000 was allocated to principal and $21,498.75 was paid in interest. (No further principal reductions were made until 1978.) On August 20, 1975, Mr. Medley sold all of his shares of Boone and Stadium to petitioners, in equal amounts. Stadium made an additional interest payment to Tower Grove in 1975 in the amount of $2,221.25 on September 8, 1975. Boone, which filed returns on a calendar year, received an extension of time to file its 1973 return. When the original 1973 return was filed on July 15, 1974, it reported no business activity for the year. The original return filed by Stadium for 1973 reported no gross income, and deductions for interest, taxes, and miscellaneous business expenses totaling $105,108. Stadium's interest payments were reported as $4,750 to Tower Grove; $18,386 to Republic; $27,891 to First National, and $10,969 to Charles *251 and Fern Leslie. The balance sheet schedule attached to the return did not report any obligations to Tower Grove by Stadium; it listed only a short-term note payable to First National with an end-of-year balance of $128,847, and the construction loan from Republic. The Schedules K-1, Shareholder's Share of Undistributed Taxable Income, reported that Messrs. Porter, Scott, and Medley each had a distributable loss of $35,036. This return was filed on July 15, 1974. Sometime in 1975, Stadium or petitioners retained the accounting firm of Price Waterhouse & Company (Price Waterhouse) to prepare 1974 tax returns for Boone and Stadium. Upon the advice of Price Waterhouse, in October 1975 both Boone and Stadium filed amended returns for 1973. Whereas the original 1973 return for Boone reported no business activity for the corporation, the amended return reported tax expenses of $1,504, interest expenses of $11,369, miscellaneous expenses of $107, and a net operating loss carryback of $20,991. The 1974 return, filed simultaneously, reported interest income of $5,925 and included as a liability of the corporation a note payable to Tower Grove for $315,000. The amended 1973 return *252 filed for Stadium also reported no income, but reported interest expense of $32,725, a decrease of $29,272 from the original return, and total deductions of $42,847, a decrease of $62,261. Among the deductions were the following expenses: Amortization
$1,320
Advertising
2,033
Telephone and Postage
983
State Registration
20
Tax Accounting Fees
100
Miscellaneous Expenses
202
Loan Commitment Fee
4,750
Total
$9,408
The Schedules K-1 attached to the amended return reported deductible losses for Petitioner Porter of $14,283 and Petitioner Boone of $14,482, decreases of $20,753 and $20,754, respectively. This return was signed and dated on October 15, 1975, by Price Waterhouse, as preparer, and on October 20, 1975, by Mr. Porter, as secretary of Stadium. The 1974 return filed by Stadium reported no gross income, interest deductions of $163,610, and total deductions of $193,034 for the taxable year. Petitioners' reported share of deductible loss from 1974 operations was $66,901 each. On a separate schedule attached to the return, Stadium listed the construction in progress on the Hilton Inn as an asset of the corporation. On another schedule, Stadium *253 reported a liability of $1,306,107 from advances for the construction contract. Upon the advice of Price Waterhouse, Stadium issued to Boone a 1974 Form 1087-INT indicating interest paid on bank deposits in the amount of $5,924.83, which represented the amount originally paid by Mercantile to St. Paul. On its 1975 tax return, Boone deducted $7,550 for interest paid and reported loss of $23,733, after incorporating a net operating loss deduction of $33,856. On a schedule attached to its return, Boone listed a note payable for $315,000 as a liability of the corporation. On its 1975 return, Stadium reported, inter alia, income of $398,227, interest deductions of $242,971, and total deductions of $582,399, yielding a loss of $184,172. Schedules K-1 attached to the 1975 return reported that each petitioner had a loss attributable to his ownership interests in the amount of $85,323. On their individual 1973 Federal income tax returns, Petitioners Scott took a deduction of $29,783.59 for losses attributable to Stadium. Application for tentative refund from carryback to 1970 of a net operating loss in the amount of $5,952.65 was granted by respondent. They did not file an amended *254 return for 1973.On their 1974 and 1975 joint Federal income tax returns, Petitioners Scott deducted $20,000 and $85,323, respectively, attributable to losses of Stadium. Petitioners Porter filed their 1973 joint Federal income tax return on or about January 5, 1975, and deducted losses of $35,036.05 attributable to Stadium. They did not file an amended return for 1973. They filed their 1974 return on or about April 14, 1976, and deducted a loss in the amount of $66,901 attributable to Stadium. They did not receive extensions of time to file for either 1973 or 1974 and have offered no explanation for their late filing. On their 1975 return, also filed on or about April 14, 1976, the Porters deducted a loss in the amount of $85,323, attributable to Stadium. By notices of deficiency sent to each petitioner, respondent determined that Stadium received interest income in 1974 in excess of the statutory limit, which terminated Stadium's Subchapter S election for 1974 and 1975, and, accordingly, respondent disallowed all of petitioners' deductions for 1974 and 1975 attributable to Stadium's activities. Respondent also reduced petitioners' deductions for 1973 attributable to losses *255 by Stadium to reflect the decrease in distributable income reported by Stadium on its amended return. The loss carryback to 1970 taken by Petitioners Scott was also denied. By amended answer, respondent asserted that in calculating distributable income, Stadium took deductions for operating expenses that were not deductible in 1973 because Stadium was not yet doing business. According to respondent, any distributable loss available to petitioners for 1973 must be reduced by the amount of those expenses, which was $9,408. Respondent, in his amended answer, asserted that if Stadium's election was not terminated in 1974, petitioners had insufficient bases in their shares of Stadium to support most of the 1974 and 1975 deductions taken with respect thereto. ULTIMATE FINDINGS OF FACT 1. Stadium was not entitled to deduct $9,408 in operating expenses in 1973. 2. Stadium realized $5,924.83 in interest income in 1974. OPINION Petitioners failed to introduce evidence on two questions raised by respondent in the notice of deficiency. The first question is whether petitioners' shares of distributable loss from Stadium's 1973 activities must be reduced on their individual 1973 *256 returns to reflect the decreased amount reported on Stadium's amended 1973 return and Schedules K-1. The second question is whether Petitioners Porter are liable for additions to tax under section 6651(a) for 1973 and 1974. Petitioners bear the burden of proof on these issues; accordingly, as to them we hold for respondent. Rule 142(a) Tax Court Rules of Practice and Procedure. Because respondent waited until his amended answer to assert that Stadium was not entitled to deduct certain expenses in 1973, respondent has the burden of proof on that question. Although respondent also raised other questions herein, primarily as alternative theories to support his initial determination, our conclusion that Stadium's Subchapter S election was terminated for 1974 and 1975 obviates the need for us to decide these issues. Other issues have been settled by the parties. 1973 Deficiencies
In his amended answer, respondent contended that Stadium was not entitled to deduct currently certain expenses in its calculation of distributable income, and that petitioners' losses attributable to Stadium must be decreased accordingly.The disputed deductions were for amortization, the commitment *257 fee for the letter of credit, tax accounting fees, and advertising, telephone, postage, registration, and miscellaneous expenses. Respondent asserts that because the Hilton Inn was not open for business until 1975, under section 162 these expenses are "pre-opening" in nature and not deductible in 1973. The relevant part of section 162(a) provides: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. [Emphasis added.] Current deductions for expenses incurred by taxpayers prior to the beginning of actual business operations are not allowable under section 162. Richmond Television Corp. v. United States,345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); Bennett Paper Corp. v. Commissioner,78 T.C. 458 (1982), affd. 699 F.2d 450 (8th Cir. 1983); *258 Goodwin v. Commissioner,75 T.C. 424, 433 (1980), affd. without opinion 691 F.2d 490 (3d Cir. 1982); Hoopengarner v. Commissioner,80 T.C. 538, 540 (1983). [3] Petitioners do not deny this, but claim that section 1.1372-4(b)(5)(ii)(b), Income Tax Regs., supports their contention that Stadium's business operations had begun in 1973. Section 1.1372-4(b)(5), Income Tax Regs., provides: (5) Passive investment income--(i) In general. Except as otherwise provided in subdivisions (ii) and (iii) of this subparagraph, an election under section 1372(a) shall terminate if for any taxable year of the corporation the corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (hereinafter referred to as "passive investment income"), as determined in accordance with the rules of this subparagraph.
(ii) Taxable years ending after April 14, 1966. (a) Notwithstanding the provisions of subdivision *259 (i) of this subparagraph, an election under section 1372(a) shall not terminate, under this subparagraph, for any taxable year of the corporation ending after April 14, 1966, if (1) such taxable year is the first taxable year in which the corporation commenced the active conduct of any trade or business or the next succeeding taxable year, and (2) the amount of passive investment income for such taxable year is less than $3,000. (b) The determination of the first taxable year in which the corporation commenced the active conduct of any trade or business presents a question of fact which must be determined in each case in light of all the circumstances of the particular case. For purposes of this subparagraph, a corporation will be deemed to have commenced the active conduct of a trade or business in the taxable year in which it first engages in activities (other than activities merely incidental to the organization of the corporation) designed or intended to enable it to engage in any business operations.Thus, for example, a corporation organized to operate a restaurant business *260 will be deemed to have commenced the active conduct of a trade or business, for purposes of this subparagraph, in the taxable year in which construction of the restaurant facility is undertaken or real property is purchased or leased by the corporation for such use. * * * Petitioners have overlooked the fact that the clear language of the cited subdivision limits the test for determining when business has begun that is enunciated therein to the purposes of the subparagraph of which it is a part. Specifically, subparagraph (5) states the rule that a Subchapter S corporation will lose its election if more than 20 percent of its gross receipts is passive investment income. An exception to the general rule is expressed in subdivision (ii), which provides that the 20-percent rule will be disregarded if (1) the election is with respect to the first year the corporation commenced business activities, or the succeeding taxable year and (2) the total passive investment income is less than $3,000. *261 For the purposes of determining the applicability of this exception to the 20-percent rule, "a corporation organized to operate a restaurant business will be deemed to have commenced the active conduct of a trade or business * * * in the taxable year in which construction of the restaurant facility is undertaken or real property is purchased or leased by the corporation for such use." This test does not extend beyond this subparagraph and does not aid in determining whether an item is deductible under section 162.
The regulations are of no help to petitioners here. It is clear that Stadium did not begin business activities until 1975. The disputed deductions are indeed of the type held by this Court to be pre-opening in nature and thus may not be included when calculating Stadium's distributable income for 1973. See Goodwin v. Commissioner,supra at 433. 1973 and 1975 Deficiencies
Respondent determined that Stadium had gross receipts in 1974 of $5,924.83, all of which was passive investment income. According to respondent, Stadium's Subchapter S election terminated in 1974 under section 1372(e)(5)(A)[4] and petitioners therefore, are not entitled *262 to take any deductions in 1974 or 1975 with respect to Stadium's activities. Petitioners' claim "that on May 23rd, 1974, when the sum of $315,000 was transferred to St. Paul, the commitment to make a loan to Boone was fulfilled and a loan to Boone in the amount of $315,000 came into existence." They argue that the money advanced under the letter of credit to St. Paul and invested, in part, with Mercantile was Boone's, and so the interest paid by Mercantile was also Boone's. But the evidence in this case undeniably demonstrates that the *263 letter of credit was issued on behalf of Stadium, the funds were deposited by St. Paul on behalf of Stadium, and the interest was paid to St. Paul on behalf of Stadium. Stadium, not Boone, realized $5,924.83 in interest income in 1974. Documentary evidence, primarily bank records presented by respondent, compels the conclusion that the certificate on which interest was paid belonged to Stadium. Petitioners' exhibits support this conclusion as well. For example, Mr. Porter's letter of March 21, 1983, to Mr. Hutchens shows that the purpose of the loan originally requested from First National and subsequently obtained from Tower Grove was to make up the difference between the estimated cost of the project to Stadium and the financing already promised by Republic. In addition, Mr. Potthast testified at trial that the letter of credit was for gap financing for the Hilton project -- a project of Stadium's, for it was Stadium who held the Hilton franchise. Other documents support respondent's position that the letter of credit was issued on behalf of Stadium. The resolution of Boone's board of directors, executed simultaneously with Boone's note and deed of trust of April 30, 1973, described *264 the purpose of the note and deed of trust as being to secure "the loan to Stadium Boulevard Company." That loan was not made until the letter of credit was actually funded in May 1974. Meanwhile, in August 1973, Tower Grove issued the letter of credit to St. Paul; it was secured by a demand note signed by Stadium, that was in turn secured by a note and a deed of trust pledged by Boone. The extent of Boone's role was as a guarantor of Stadium's promise to Tower Grove; Boone was not even a part of the agreement with St. Paul. Petitioners agree with respondent that there was no indebtedness to Tower Grove prior to the time St. Paul requested funding of the letter of credit. Part of those funds were invested by St. Paul with Mercantile and yielded $5,924.83 in interest. That interest belonged to the owner of the funds deposited with St. Paul -- Stadium -- and that is why St. Paul paid the interest over to Stadium. Additional evidence in the record supports the conclusion that it was not until after petitioners hired an accounting firm and discovered the consequences of their poor planning that they considered the loan from Tower Grove and the interest from Mercantile to belong *265 to Boone. But even after amended returns were filed, it was Stadium that was reporting and deducting the costs of the financial arrangements with Tower Grove. Petitioners may not choose to have separate corporate identities and then ignore them when they do not serve their tax purposes. See Moline Properties, Inc v. Commissioner,319 U.S. 436 (1943).The interest paid was Stadium's, not Boone's; as a consequence, Stadium's election to be taxed under the provisions of Subchapter S terminated in 1974. Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. At some point, the lender and borrower agreed to "round off" the original request to $315,000.↩
3. See, however, section 195 which permits start-up expenditures paid or incurred after July 29, 1980, to be amortized and deducted ratably over a period of not less than 60 months.↩
4. Section 1372(e)(5)(A) in effect in the years in issue provided: (A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income.Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.↩