## NATURAL GAS PIPELINE CO. OF AMERICA v. FEDERAL POWER COMMISSION et al.
### No. 7454.

Circuit Court of Appeals, Seventh Circuit.
June 30, 1942.

See, also, 129 F.2d 515.

J. J. Hedrick, of Chicago, Ill., S. A. L. Morgan, of Amarillo, Tex., and Geo. I. Haight, of Chicago, Ill., for petitioners.

Charles V. Shannon, Stanley M. Morley, and Edmond H. Lange, for respondent Federal Power Commission.

Wm. S. Youngman, Jr., Richard J. O'Connor, Geo. Slaff, and Daryal A. Myse, all of Washington, D. C., and Geo. F. Barrett, of Chicago, Ill., for other respondents.

Before EVANS and KERNER, Circuit Judges.

## PER CURIAM.

The first problem is to determine the net amount of the refund. To do this, it will be necessary to determine whether or not there is liability for income or excess profits taxes, and, if so, in what amount. It will also be necessary to anticipate with such accuracy as may be possible the cost of making the refund and any other expenses properly chargeable against the fund. The cost of making the refund, will depend upon the method employed. If one of the simple, short-cut methods hereinafter outlined can be followed, this cost would be but a small fraction of that which would be entailed in carrying out a fully elaborated method of arriving at the amounts to be refunded.

Two short-cut and practical methods of making this refund are as follows:

(a) The utility companies would furnish the figures from which the percentage which the sum to be. refunded bears to the total amount charged to their customers would be determined. A list of the names and addresses of all such customers must be obtained and the refund mailed to them or credited on such customers' current bills. The cost of carrying out the utilities' part in this method and the cost of sending refund checks to some 850,000 consumers of the Peoples Company would involve an additional expense.

(b) An even less expensive method would be to have the company make the refund in its entirety by making a percentage deduction from the amounts of the customers' gas bills for some selected future month or months, and crediting the amount of the refund against the amounts due to the company from the customer. If this method could be used all cost of making and mailing checks would be avoided, and the cost of carrying out the Company's part of making the refund on this basis would not exceed $100,000.

■ It may be found that a distribution under method (a) would establish the most favorable possible basis for the necessary closing agreement with the Commissioner of Internal Revenue. It would relieve the Peoples Company of any possible liability for income and excess profits taxes in connection with the fund. We are thoroughly satisfied that there is no liability of any of the utilities for Federal income tax where this money is paid to the consumer. We also are convinced that there would be no liability of any utility that received the money from petitioners and paid the sum to its customers in the same year it was received. We are also well satisfied, that if the sum were paid by petitioners to the utilities and any one of the utilities should hold such payments, or take action which asserted ownership thereof, then said utility or utilities would be subject to a Federal income tax.

■ (c) Another alternative method of making the refund would contemplate the recomputing of all bills actually rendered during the twenty or more month period in which the fund was accumulated, and the payment to each customer of a sum computed on the basis of bills rendered before discount for prompt payment, etc. This method, while more exact theoretically, would nevertheless involve many assumptions, and would perhaps create more problems than it would solve. The cost of making the refund to the Peoples Company's customers on this basis would be out of all proportion to the cost of either of the short-cut methods described above, probably falling somewhere between $350,000 and $500,000. The difference in cost would be so great that it is quite possible that in every instance the consumer would actually receive a larger refund under one of the more simplified methods (a) or (b). It should also be noted that by using one of the short-cut methods the time employed in making the refund would certainly be shortened.

Even if the labor could be obtained to carry out plan (c), we hold it should not be adopted. Whether plan (a) or plan (b) be adopted will depend on the report of our specially appointed official, Mr. Tappan Gregory, who is directed to investigate and report to us on the merits and practicability of both plans.

■ Before we can determine the total amount to be refunded to the customers, we must be informed on the cost of distribution. Two substantial items are Clerk's fees of 1% of the fund (this is fixed by statute and goes to the U. S. Government ultimately, though collected by the Clerk) and postage of either 2 cents or 3 cents depending on where the customer lives. A third item is the cost of the services (labor mostly) of making checks and computing the amount of refund. The number of customers is estimated at over 850,000.

On this matter, too, we direct Mr. Gregory, as officer of this court, to investi-

gate and report, and at an early date, what he estimates said cost will be.

■ Associated with this problem of costs, one utility serving Nebraska City asks that the refund go to it and not to its customers. That it and others may know and plan accordingly, we express our conclusion, and our holding, which is *all refunds which petitioners must make, belong to the consumers,* for whose benefit these proceedings were instituted. The utilities with whom petitioners contracted, were merely conduits, by which natural gas transported by petitioners was delivered to customers by utilities. The refunds do not belong and should not go to the utilities. The price paid by the utilities was fixed by contract. It, together with cost of services and interest, etc., was what made up the utilities' bill to their consumers. These rates or charges were approved by the Illinois Commerce Commission. The proceedings which were instituted by Federal Power Commission and furthered by the Illinois Commerce Commission to reduce the natural gas cost to the utilities were for the benefit of the consumers. They so declare. Most of the utilities have steadfastly disclaimed any right to or interest in the refund. They realize that the proceedings were for the benefit of the consumers, not to enrich them. An exception is the Nebraska City utility, which believes it is the beneficiary of a windfall, to which it intends to hold on, if once it can get possession of it. It entertains the old and outmoded conception of utility magnates and utility counsel which overlooked the trustee status of a public utility, whose excuse for existence is service to the public to whom it owes the duty to diligently endeavor to render ever better service at lower rates, as well as to earn a fair return on the capital invested in it. In fact it was the position of counsel for the Pipeline company in the U. S. Supreme Court that under no circumstances could the utility claim any refund and that if anyone was entitled to the refund, it would be the consumers.

■ A public utility located in Nebraska City and another located in Iowa held contracts with petitioners. As between the two contracting parties, their contract would be binding, but the business of the petitioners was subject to regulation by the Federal Power Commission and also in part by the Illinois Commerce Commission. These two bodies sought to reduce charges

to the consumers. As between petitioners and utilities they were not interested, but these boards were interested in reducing charges to the consumers. For the consumers the Federal Power Commission acted. Petitioners so understood the nature of the contract and defended on the ground that they had no contract with these consumers and owed nothing to them as consumers,—nor were they subject to Federal regulation for the consumers' benefit. Nebraska City and all other utilities stood by and accepted the situation as it was tendered by the pleadings and the parties. Now one or two of these utilities located where no state supervisory commission exists, are endeavoring to seize the fruits of the litigation brought for the consumers and retain the money for their own individual gain. It would be a gross travesty upon the proceedings, if they were to succeed. With their efforts in this respect, we have no sympathy.

The court will make an order on this finding that the money refunded by petitioners belongs to the consumers and none belongs to the utility or utilities.