IOWA SOUTHERN UTILITIES COMPANY and Subsidiary Companies, Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant-Appellee.

No. 87–1339.

United States Court of Appeals, Federal Circuit.

March 15, 1988.

---

K. Martin Worthy, Hamel & Park, Washington, D.C., for plaintiffs-appellants. With him on the brief was Gregory K. Oyler.

Mary Frances Clark, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee. With her on the brief were James B. Mann, Acting Asst. Atty. Gen., Michael L. Paup and Jonathan S. Cohen.

Before FRIEDMAN and MAYER, Circuit Judges, SKELTON, Senior Circuit Judge.

## OPINION

MAYER, Circuit Judge.

Iowa Southern Utilities Company and Subsidiary Companies (Iowa Southern or utility) appeal the decision of the United States Claims Court, 11 Cl.Ct. 868 (1987), holding that the electricity surcharges it collected were includable in gross income, were not deductible as a business expense, and were not advance payments for electric service. We affirm.

### Background

Iowa Southern is a public utility which supplies electric service to residential and commercial customers in southern and southeastern Iowa. In 1976, Iowa South-

ern and two other utilities began construction of a $350 million power plant in Ottumwa, Iowa. To cover the costs of financing the construction, the Iowa State Commerce Commission (Commission), which determines the rates public utilities are permitted to charge, approved a proposal allowing Iowa Southern to assess a special surcharge on its customers for electric service during the last three years the project was under construction. After the plant began operating, the amount collected as a surcharge would be "refunded" without interest over thirty years in the form of a negative surcharge. Adoption of this plan was initially conditioned on a determination by the Internal Revenue Service (IRS) that the surcharge would not result in additional income tax liability to Iowa Southern.

The IRS ruled, however, that the surcharges would result in taxable income during the years they were collected and that the negative surcharges would reduce taxable income over the following thirty years. Nevertheless, the Commission adopted the plan, with Iowa Southern's concurrence. A March 1978 stipulation between the Commission and Iowa Southern provided:

> Beginning with April, 1978 billing, [Iowa Southern] may service the cost of financing the construction of its share of the Ottumwa Generating Station by means of mandatory monthly surcharges which are to be unconditionally refunded to customers upon the commencement of commercial operation of the generation station in accordance with a tariff to be filed with the Commission.

This stipulation was approved in an April 1978 order of the Commission, which reiterated that the "mandatory monthly surcharges ... are to be unconditionally refunded to customers." The tariff sheet, in which the Commission approved electricity charges, stated:

> The charges for electric service shall be increased to recover the financing charges associated with [Iowa Southern's] portion of the construction cost of the Ottumwa Generating Station #1 (OGS). The increased billing shall constitute a "customer surcharge", the total of which shall be refundable without inter-

est over the life of OGS to the then existing customers. The life of OGS used for refunding purposes shall be the same as that used for book depreciation, this not to exceed 30 years.

The customers' bills included a cost adjustment, of which the surcharge was a component. Both the surcharge and the subsequent negative surcharge were calculated on the basis of the number of kilowatt hours of electricity used by each customer. The bills did not indicate that the surcharges were anything other than a charge for the electric service of the previous month and Iowa sales tax was collected on the gross receipts from the sale of electricity, which included the amount of the surcharge (either as an addition to or a deduction from the bill).

From June 1978 to May 1981, Iowa Southern collected $12.3 million in surcharges, which were not segregated in a separate account and were available for general corporate use. The power plant was completed in May 1981 and in the following month rate reductions through a negative surcharge went into effect. The reductions are to continue for thirty years from this date and will be received by all utility customers during this period, regardless of whether or not they were customers when the surcharges were collected.

Although Iowa Southern, which uses the accrual method of accounting, did not include the surcharges as income on its federal tax returns for 1978, 1979 and 1980, it did treat them as gross receipts in levying the Iowa sales tax. The IRS assessed deficiencies for these years because of its view that the surcharges should have been included in income when collected. Under protest, for 1981 Iowa Southern included the surcharges as income but reduced the total by the amount of the negative surcharges for that year.

Iowa Southern then filed this tax refund suit in the Claims Court. In ruling for the United States, the court determined that the surcharge fit "squarely within" the definition of gross income and could not be

considered a loan. It also rejected the utility's alternative contention that because it had an obligation to "refund" the surcharge in the future, it was entitled to a simultaneous offsetting deduction. Lastly, the court found no merit in another alternative argument that the surcharges should be treated as advance payments for electric service to be included in income only in the years, and for the amounts, in which the negative surcharges are imposed. Iowa Southern reasserts these three arguments here.

### Discussion

#### I

■ Section 61(a) of the Internal Revenue Code * provides that "gross income means all income from whatever source derived, including (but not limited to) ... [c]ompensation for services, including fees, commissions, and similar items." The Supreme Court "has given a liberal construction to the broad phraseology of the 'gross income' definition statutes in recognition of the intention of Congress to tax all gains except those specifically exempted." *James v. United States*, 366 U.S. 213, 219, 81 S.Ct. 1052, 1055, 6 L.Ed.2d 246 (1961). The tariff sheet, which establishes the utility's authorized rates, provides that the "charges for electric *service* shall be increased to recover the financing charges associated with [Iowa Southern's] portion of the construction cost" of the power plant. (Emphasis added.) This suggests that the surcharges were simply compensation for electric service.

Iowa Southern says, however, that the surcharges are in reality loans and therefore should not be included in income. It alleges that the surcharges have numerous characteristics of bona fide debt, including the fact that the obligation to "repay" was committed to writing and was unconditional, "substantial repayments" have been made, and the surcharges were treated as a liability for accounting purposes by the utility and the Commission.

These arguments are unpersuasive. Although the stipulation and order state that the surcharges are to be "unconditionally refunded," we agree with the Claims Court "that these documents set up no obligation to pay; they establish no liability. Rather, all that they accomplish is a declaration of regulatory policy: that rates shall be raised in certain years and then lowered in subsequent years to offset the increase." 11 Cl.Ct. at 874. Those documents do not establish that a loan agreement existed, and neither does the tariff sheet, which characterizes the surcharge as an increase in the electric service charge, nor the customers' bills, in which the surcharge was included as a cost of electricity and was considered income when the Iowa sales tax was levied. The customers were never informed of a loan agreement and, indeed, never agreed to one. It would be an unusual loan where the purported repayments are made to utility customers regardless of whether or not they had paid a surcharge, and without the payment of interest.

Iowa Southern argues that its treatment of the surcharges as a liability for accounting purposes is further evidence that they are borrowed funds. However, the Supreme Court has recognized "the vastly different objectives that financial and tax accounting have," and that "any presumptive equivalency between tax and financial accounting would be unacceptable." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542–43, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979); *see Frank Lyon Co. v. United States*, 435 U.S. 561, 577, 98 S.Ct. 1291, 1300, 55 L.Ed.2d 550 (1978) ("characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same"). The utility points to the Supreme Court's statement that "where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and* that method clearly reflects income, it is almost presumptively controlling of federal income

---

* Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, 26    U.S.C.

tax consequences." *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15, 94 S.Ct. 2757, 2766, 41 L.Ed.2d 535 (1974). Iowa Southern was apparently following accounting guidelines of the Commission and the Federal Energy Regulatory Commission, but it cites nothing in the guidelines that required that the surcharges be excluded from income. Indeed, if they had, the accounting method would then not have reflected income. *See Frank Lyon Co.*, 435 U.S. at 577, 98 S.Ct. at 1300 ("Accounting methods or descriptions, without more, do not lend substance to that which has no substance.").

But the utility says *Illinois Power Co. v. Commissioner*, 792 F.2d 683 (7th Cir.1986), and *Mutual Telephone Co. v. United States*, 204 F.2d 160 (9th Cir.1953), "require a conclusion that Iowa Southern's surcharges are not income." In *Illinois Power*, the Illinois Commerce Commission ordered the utility to increase its rates to certain commercial customers and later ordered that the receipts be disbursed in the form of a credit on the bills of all the utility's customers. As in our case, the Illinois Commission did not require the receipts to be segregated from the utility's other funds. The Seventh Circuit said the receipts were not taxable income. 792 F.2d at 690.

However, *Illinois Power* is of no help to Iowa Southern. The rate increase there was designed "not to make Illinois Power better off but to limit the consumption of electricity" and encourage conservation. *Id.* at 687. Unlike in our case, the utility there was required to pay "full interest" on the amounts received and, indeed, did pay interest equal to its rate of return. As the court stated, "Not only did Illinois Power know from the start that it would have to pay back the money; the Illinois Commerce Commission made clear from the start that the company would also have to turn over any interest earned on the money. Illinois Power could thus derive no benefit at all from having held the money. It was an unpaid collection agent...." *Id.* at 690. Illinois Power's inability to derive any benefit from holding the money stands in stark contrast to our situation where, as Iowa

Southern concedes, "the financing cost— i.e., the cost of carrying the construction during the period of construction, not the cost of construction itself—[will] be obtained" by the mandatory monthly surcharges. Furthermore, that the utility decided to proceed with the surcharge plan, despite an IRS ruling that the surcharges would be includable in gross income and not subject to offsetting deductions, is persuasive that it would benefit economically even without the favorable tax treatment.

The Seventh Circuit also said, "The underlying principle is that the taxpayer is allowed to exclude from his income money received under an unequivocal contractual, statutory, or regulatory duty to repay it, so that he really is just the custodian of the money." *Id.* at 689. Of course, we have discerned no unequivocal duty to "repay" in our case. But even if we had, this statement does not aid Iowa Southern because it is not simply a custodian of the money. Iowa Southern entered into the transaction so it could cover its construction financing costs. The Seventh Circuit specifically relied on the lack of any gain to the electric company because of the requirement to pay interest equivalent to its rate of return. *Id.* at 688. It also observed that it was clear from the start that Illinois Power was in effect a "fiduciary" of the ratepayers and could derive no benefit from holding the money. *Id.* Our situation is entirely different; obviously Iowa Southern benefited from this transaction.

But Iowa Southern counters that, because it did not include the unrefunded surcharges in its rate base, it reaps no economic benefit from them. The utility offers a detailed discussion of how changes in the rate base affect its rates and revenue. It is unnecessary to dissect this argument because, unlike the utility in *Illinois Power* which also did not include the funds in its rate base, the only reason for Iowa Southern to adopt the surcharge plan was to receive a benefit. That is the critical distinction, and is supported by the stipulation which recites that "regardless of the income tax outcome" the surcharges will not be included in the rate base. In any

event, in *Illinois Power*, the court of appeals did not consider the effect of the transactions on the rate base or the relationship between the rate base and federal income taxes. The possible permutations in rate base adjustments are not dispositive of the tax consequences.

*Mutual Telephone* is also of no help to Iowa Southern. In that case, which the Seventh Circuit viewed as "indistinguishable" from *Illinois Power*, 792 F.2d at 690, a public utility commission ordered the telephone company to raise certain rates to discourage the demand for telephone service. The money was not segregated into a special account, but the telephone company, as required, "kept on hand at all times sufficient cash or marketable securities so that it could immediately comply with any order the Commission might make as to the disposition of the fund." 204 F.2d at 161. The court stated that the utility commission's order "in effect directs [the telephone company] to retain custody of the moneys or its equivalent until further disposition is directed." *Id.* Under these circumstances the court held the receipts were not taxable income. *Id.* at 162. This was because they were not originally intended to benefit the telephone company. Only when the company later deposited the receipts to its account and for its benefit, as directed by the Commission, did they become taxable income. The fact that the telephone company did not add the funds received from this rate increase to its rate base is irrelevant. Neither *Illinois Power* nor *Mutual Telephone* address the situation we have.

## II

█ Iowa Southern contends that if the surcharges are not borrowed funds excludable from income, then there is "no question" that the "obligation to repay the surcharges" should be treated as a current business expense deductible under section 162 or as "part of the cost of goods sold deductible from gross receipts in determining gross income." The utility also says that because it is an accrual basis taxpayer and its obligation to "repay" the surcharges satisfies the all events test, they are

deductible under Treas.Reg. § 1.461–1(a)(2) when the liability accrues. *See United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347 (1926). In its view, this was when the customers were billed.

Under section 162(a), "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...." A deduction, however, "is a matter of legislative grace and ... the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943). Iowa Southern cites the stipulation, order, and tariff sheet for the proposition that there is a liability to "refund" and, consequently, an expense, but this characterization does not control. *Cf. City Gas Co. of Florida v. Commissioner*, 689 F.2d 943, 949 (11th Cir.1982) (financial accounting method treated as liability what court ruled was, in reality, income). As we have discussed, the documents do not establish a liability to "refund;" they simply set out a regulatory policy on the allowable rates for electric service. In fact, the negative surcharges will be applied to the bills of all customers during the 30–year period it is in effect, without regard to whether they were customers when the surcharges were assessed. Accordingly, it is inaccurate to speak in terms of a "refund" because former customers who paid surcharges have no entitlement to any money and current customers who paid surcharges cannot purchase electricity at a rate more favorable than current customers who did not pay surcharges. Therefore, Iowa Southern's only obligation is to reduce its rates to its then-current customers pursuant to the specified formula.

The Claims Court said, "It suggests a confusion in thought to argue that the expected future reduction in the charges for electric service qualify as a cost, *i.e.*, a deduction, incurred in the process of producing the income generated through the allowed increase in charges." 11 Cl.Ct. at

874. We agree. In reality, Iowa Southern must be viewed simply as enjoying higher rates, and greater income, during the construction period, and lower rates, and presumably less income, during the thirty years that follow completion of the plant. As a result, it is also incorrect to view the change in the rate structure as a cost of goods sold. And nothing in the record suggests that the Commission must adhere to the negative surcharges as time goes on.

The all events test, which Iowa Southern says it meets, states that *"an expense is deductible* for the taxable year in which all the events have occurred which determine *the fact of the liability....."* Treas.Reg. § 1.461–1(a)(2) (emphasis added). The test is inapplicable here because there is no expense to deduct and no liability has been incurred. And, *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986), and *Washington Post Co. v. United States,* 405 F.2d 1279, 186 Ct.Cl. 528 (1969), are of no aid to the utility because in those cases the all events test could be applied only because there was a deductible expense. In fact, in *Hughes Properties,* there was no dispute over the existence of a deductible expense and the Court also found a "fixed liability," 106 S.Ct. at 2095, 2097; in *Washington Post,* the Court of Claims found that the amount in question was an "absolutely fixed" liability and deductible as an expense. 405 F.2d at 1283, 1284.

### III

If the surcharges are includable in gross income and their deduction as an expense is denied, then Iowa Southern says they must be advance payments under Treas.Reg. § 1.451–5 and should be included in income only in the years the negative surcharges are credited to the accounts of the customers. This argument is without merit.

Advance payment is defined as "any amount which is received in a taxable year by a taxpayer using an accrual method of accounting ... pursuant to, and to be applied against, *an agreement* ... [f]or the sale or other disposition in a future taxable year of goods held by the taxpayer...." Treas.Reg. § 1.451–5(a) (emphasis added). Iowa Southern does not show any agreement with its customers to pay in advance for their future electric service or, for that matter, for someone else's service which under this theory would happen to customers who discontinue their service after paying the surcharges. We agree with the Claims Court that "[a]ll that can be said is that a customer's consumption of electricity gave rise to an implied in fact agreement to pay for that month's service at a rate set by Commission order." 11 Cl.Ct. at 874.

### Conclusion

Accordingly, the judgment of the Claims Court is

AFFIRMED.

FRIEDMAN, Circuit Judge, dissenting.

I agree with and join parts I and III of the court's opinion, which hold, respectively, that the surcharges were gross income of the company and cannot be treated as advance payments for electricity. I disagree with the court, however, that the company's obligation to refund without interest the surcharges over the life of the power plant does not create a deductible expense.

The pertinent Treasury Regulations provide that an accrual-basis taxpayer may deduct an expense in the taxable year "in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." 26 C.F.R. §§ 1.461–1(a)(2), 1.446–1(c)(1)(ii) (1987). I think that Iowa Southern satisfied the "all events" test with respect to its obligation to refund the surcharges to its customers.

The stipulation between Iowa Southern and the Iowa State Commission that provided for the monthly surcharges unequivocally stated that the surcharges collected "are to be unconditionally refunded to customers" upon the commencement of commercial operation of the new plant. There was nothing contingent or uncertain about

that obligation. Once the plant became operative, Iowa Southern was required to refund the amount of the surcharges by reducing the electric rates for its customers until the total amount of the surcharges it had collected had been returned. It makes no difference in determining the tax consequence of that obligation that the refund took the form of a reduction of future rates rather than a cash refund equal to the amount of that reduction. *Cf. Natural Gas Pipeline Co. v. Federal Power Comm'n,* 134 F.2d 263 (7th Cir.1942); *Carrol v. Commissioner,* 40 T.C.M. (P–H) ¶ 71,059 (1971); Rev.Rul. 63–182, 1963–2 C.B. 194.

It is immaterial that the refund would not necessarily go to all the customers who paid the surcharge or that some customers who had not paid the surcharge would receive refunds. As the Court of Claims explained in *Washington Post Co. v. United States,* 405 F.2d 1279, 1284, 186 Ct.Cl. 528 (1969), "[W]hen a 'group liability' is involved, it is the certainty of the liability which is of utmost importance in the 'all events' test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees." "[W]e cannot see what difference it makes

that the refunds here were to a class of customers some or many members of which may have been different individuals from those who paid the higher rates ordered by the Commission." *Illinois Power Co. v. Commissioner,* 792 F.2d 683, 689 (7th Cir.1986).

Here, as was the situation with the progressive slot machines involved in *United States v. Hughes Properties, Inc.,* 476 U.S. 593, 106 S.Ct. 2092, 2096, 90 L.Ed.2d 569 (1986), the taxpayer's obligation to pay the refund was "definitely fixed" at the end of each fiscal year in which the surcharges were received. Moreover, the total amount to be refunded could not merely "be determined with reasonable accuracy"—the standard under the Treasury Regulations—but could be ascertained exactly. It was the total additional amount paid during that year by Iowa Southern's customers through the surcharges.