**HOUSTON INDUSTRIES INCORPORATED AND SUBSIDIARIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1570T.**

United States Court of Federal Claims.

Oct. 11, 1994.

Gregory V. Nelson, Houston, TX, for plaintiff; Richard A. Husseini, Houston, Texas, of counsel.

Benjamin C. King, with whom were Asst. Atty. Gen. Loretta C. Argrett, and David Gustafson, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This action, brought pursuant to the Tucker Act, 28 U.S.C. § 1491 (1988), and section 7422 of the Internal Revenue Code ("IRC") of 1986, as amended, 26 U.S.C. § 1 *et seq.* (1986), is before the court on the parties' cross-motions for partial summary judgment. After considering the written and oral arguments, the court concludes that the plaintiff's motion should be granted and the defendant's motion should be denied.

### FACTUAL BACKGROUND

Plaintiff, Houston Industries Incorporated and Subsidiaries ("HII"), operates a public utility, Houston Lighting and Power Company ("HL & P"), that provides electrical service to customers in the Texas gulf coast region. Under Texas law, HL & P is subject to the regulation and supervision of the Public Utility Commission of Texas ("PUC"). The PUC has promulgated specific rules governing how a utility may determine the fuel cost component of its customers' electrical bills. Each month, HL & P includes in its bills for electrical service an amount designed to compensate it for recoverable fuel costs incurred.

By law, HL & P is entitled to reimbursement for its actual, reasonable fuel costs. Prior to 1983, the method by which a Texas utility recovered its fuel cost from its customers was not heavily regulated by the PUC. Each month, HL & P estimated its fuel cost

and used this estimate to determine the base rate at which it calculated the fuel cost component of a customer's bill. Because of the inherent difficulties in forecasting exact fuel cost, the rates HL & P charged its customers for fuel did not always reflect HL & P's actual costs. On some occasions HL & P overrecovered for a given month (customer payments exceeded actual fuel costs), while on other occasions HL & P underrecovered (actual fuel costs exceeded customer payments). Pursuant to PUC rules, HL & P was required to account for overrecoveries and underrecoveries by making adjustments to its customers' subsequent bills. For such purposes, the PUC approved the use of an "automatic fuel adjustment clause."

Under the automatic fuel adjustment clause, any overrecovery of fuel costs received by HL & P from a customer in month one was automatically refunded in month four by reducing the customer's electrical bill by the amount of the month one overrecovery. Similarly, HL & P would recover a month one fuel cost underrecovery by automatically increasing a customer's month four bill by the amount of the month one underrecovery.

Due to the dramatic increase in the cost of natural gas in the early 1980's, customers of HL & P began to receive significantly higher electrical bills. These higher utility bills became a hot political issue in the 1982 governor's race in Texas. At the urging of the successful gubernatorial candidate, the Texas legislature amended section 43(g) of the Public Utility Regulatory Act, Tex.Rev.Civ.Stat. Ann. art. 1446c (Vernon 1980) ("PURA"), so as to prohibit the use of fuel adjustment clauses after September 1983.

In response to this statutory change, the PUC held hearings to determine what mechanism to employ to replace the fuel adjustment clause. Pursuant to its authority under Article III, section 16 of PURA, the PUC promulgated Substantive Rule section 23.23, which required each utility to bill its customers a fixed amount per kilowatt hour ("Kwh") for fuel ("fixed fuel factor"). 16 Tex.Admin.Code § 23.23, 8 Tex.Reg. 2970–71 (1983) ("PUC Sub.Rule § 23.23").[1]

The PUC was responsible for approving a fixed fuel factor for each utility. Once approved, the factor was to remain unchanged for at least one year or until changed by order of the PUC. The fixed fuel factor was calculated to reflect the utility's projected fuel costs over the succeeding twelve-to twenty-four-month period, so that at the end of that period the total fuel factor payments made by customers would roughly equal the utility's actual fuel costs.

Under the fixed fuel factor scheme, the amount billed by a utility each month might be more or less than its actual fuel costs incurred in that month. When the amount billed turned out to have been greater than the utility's actual fuel costs, the utility overrecovered its fuel costs in that month to the extent of the excess. Conversely, when the amount billed was less than the utility's actual fuel costs, the utility underrecovered its fuel costs in that month to the extent of the shortfall. In an attempt to deal with the

1. PUC Sub.Rule § 23.23

(b) Electric
(1) Rates shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each class of customers, taking into consideration the need to conserve energy and resources.
(2) The provisions of this paragraph apply to all investor-owned generating electric utilities. Beginning with the September 1983 billing period of each utility, respectively, no automatic fuel adjustment clause shall be allowed. Any revision of a utility's billings to its customers to allow for the recovery of additional fuel costs may be made only upon public hearing and order of the commission. No later than August 15, 1983, each utility covered by this section shall file with the commission all information necessary to determine an interim fixed fuel factor, effective with its September 1983 billing period. On September 1, 1983, each utility shall file an application for such an interim factor. The interim fuel factor shall remain fixed until the utility's next general rate case or commission-ordered reconciliation, whichever occurs first. The monthly interim fuel factor shall be determined by dividing the actual, unadjusted fuel costs by actual, unadjusted sales for the 12–month period ending June 30, 1983.

(A) All fuel costs shall be reviewed and may be redetermined at the time of the utility's general rate case. All allowed fuel costs, including, if approved, a reconciliation of over- or underrecovery of fuel costs, shall be recovered through the energy portion of the utility's base rates.

inevitability of these overrecoveries and underrecoveries, the PUC rules provided for fuel cost reconciliations whereby the utility would be required to account to the customer for overrecoveries or the utility would be entitled to recoup any outstanding underrecoveries.[2]

HL & P recorded its overrecoveries and underrecoveries for each month in a deferred credit book account. This was a cumulative account in which the balance would increase or decrease each month depending on whether HL & P overrecovered or underrecovered for that month. In addition, HL & P was required to accrue interest on the monthly balance in its cumulative over/underrecovery account. If the cumulative balance in the account was an overrecovery, HL & P would have to credit interest to its customers. Conversely, if the balance was cumulatively in a position of underrecovery, the customers would in effect have to pay interest to HL & P's account.

A "reconciliation" refers to a hearing before the PUC to finalize the balance of the overrecovery or underrecovery of fuel cost and its related interest as of a point in time. That point in time does not necessarily correspond to the end of a calendar year or the end of a fiscal year. However, a utility is not permitted to request a reconciliation sooner than twelve months after implementing a change in its base rates unless the reconciliation is part of a general rate case or the utility files an emergency request.

On September 1, 1983, HL & P filed an application with the PUC for an interim fixed fuel factor in Docket No. 5329. Subsequent to notice and hearing, the PUC set HL & P's interim fixed fuel factor, which was calculated by dividing HL & P's actual, unadjusted fuel costs by its actual, unadjusted sales for the twelve-month period ending June 30, 1983. In its October 1983 billing month, pursuant to the PUC's order in Docket No. 5329, HL & P began to bill its customers for its allowable fuel cost by imposing the interim fixed fuel factor.

During the years at issue in this lawsuit, HL & P's cost of fuel generally decreased, but because of the fixed fuel factor scheme adopted by the PUC, HL & P was unable to pass these savings onto its customers. As a result, in 1983 and 1984, HL & P collected cumulative fuel cost overrecoveries of $20,942,090 and $77,361,286, respectively.

As of April 30, 1984, HL & P had a fuel cost overrecovery balance of $3,021,756 that was carried forward from the period prior to October 1983 and a fuel cost overrecovery balance of $69,446,294 that was collected pursuant to HL & P's interim fixed fuel factor during the period from October 1983 through April 1984. HL & P calculated that its interest on the fuel cost overrecovery balance as of April 30, 1984, was $2,354,461. In a motion filed in Docket No. 5779, on June 28, 1984, HL & P proposed to refund the fuel cost overrecoveries to its customers of record as of its August 1984 billing period.

Pursuant to the PUC examiner's recommendation in Docket No. 5779, HL & P refunded $72,743,791 to its customers of record in the months of August through December 1984 by making a credit to the bills of

---

**2.** PUC Sub.Rule § 23.23(b)(2)

(I) No less than 12 months after implementing a change in its base rates, a utility shall request reconciliation of any over-recovery of fuel cost revenues and may request an opportunity to reconcile any under-recovery of such fuel costs. Under-recovery reconciliation shall be granted only for that portion of fuel costs increased by conditions or events beyond the control of the utility and upon demonstration of proof by the utility that such conditions or events could not have been predicted or foreseen at the time the rates were established. Interest to be paid by the utility or to the utility on such over- or under-recovery of fuel costs shall be at the utility's composite cost of capital during the period the rates were in effect. Such interest shall be cal-

culated on the cumulative monthly over-underrecovery balance.

(i) ...

(ii) A utility may not request a fuel cost reconciliation if it has been granted a fuel cost reconciliation within the preceding 12 months. This subsection shall not preclude the reconciling of fuel costs and revenues or redetermination of allowed fuel costs in the general rate case as approved by the commission, and it shall not preclude the filing of an emergency request as provided in subparagraphs (F) and (G) of this paragraph.

(J) If upon audit or other finding, the commission determines that fuel cost revenue collections are excessive, it may initiate a fuel cost reconciliation hearing.

each of these customers.[3] This was an interim refund representing an effort to disgorge overrecoveries accumulated as of April 30, 1984. A final reconciliation for that period was to follow. In the succeeding months, HL & P accumulated an additional net overrecovery. In the Final Order in Docket No. 5779, the PUC stipulated that as of November 30, 1984, HL & P had a fuel cost overrecovery balance of $53,546,375, plus interest thereon in the amount of $7,221,197. This represented the net underrecoveries and overrecoveries for the period between May and November, plus accumulated interest. On January 11, 1985, as part of HL & P's general rate case, Docket No. 5779, the PUC ordered HL & P to refund its fuel cost overrecoveries in these amounts.

On May 8, 1985, the general counsel of the PUC filed a petition in Docket No. 6279, asserting that HL & P had accumulated fuel cost overrecoveries for the months of December 1984 through March 1985 and was continuing to overrecover its actual fuel costs. In response to this petition, HL & P proposed to refund all of its fuel cost overrecoveries, plus interest, through April 30, 1985. The refund proposed in Docket No. 6279 was calculated to refund HL & P's cumulative fuel cost overrecoveries attributable to the period from May 1984 through April 1985, plus the amounts that had not been refunded to HL & P's customers in the refunds previously ordered. Pursuant to the PUC examiner's recommendation and the PUC's Final Order in Docket No. 6279, HL & P refunded $147,911,623 to its customers in 1985 by remitting checks to each customer. These refunds represented approximately $137 million in overrecoveries, plus accumulated interest.

During this period, HL & P adhered to the Statement of Financial Accounting Standards No. 71,[4] which required it to record its overrecovery balance as a liability, rather than treating it as income. Thus, in financial statements filed with the Securities and Exchange Commission and shown to stockholders, the PUC, and the general public, HII and HL & P characterized the fuel cost overrecoveries as liabilities of HL & P.

For internal accounting purposes, HL & P initially classified its fuel cost overrecovery balance as a contra-asset upon receipt and then reclassified that balance as a deferred credit at the end of each year. When HL & P received an order from the PUC to refund the overrecovery balance, it reclassified the balance as a current liability. Finally, HL & P consistently reported the accrued interest on the fuel cost overrecoveries as a liability for both tax and accounting purposes.

HII timely filed its federal corporate income tax returns for the taxable years 1983 and 1984. During these taxable years, HII's books of accounts were filed on the accrual method of accounting. On its returns, HII did not include in income fuel cost overrecoveries of $20,942,089 for 1983 and $77,361,286 for 1984. It deducted interest liability accrued in 1983 and 1984 on the fuel cost overrecoveries balance in the amounts of $513,217 and $6,647,326, respectively.

The Internal Revenue Service ("IRS" or "Service") subsequently assessed HII with deficiencies of $1,563,018 for 1983 and $60,028,287 for 1984. This assessment of additional tax was based in part on the Service's inclusion in HII's income of the fuel cost overrecoveries and the denial of HII's deduction of its interest liability on the fuel cost overrecovery balance. The Service thus treated as income all amounts received from customers for electricity, regardless of whether they reflected an overrecovery of fuel costs.

3. There is not a perfect correspondence between the universe of ratepayers from whom overrecoveries are collected and the group of ratepayers who ultimately receive the refunds. The amounts in 1984 and 1985 were refunded or credited to then-existing customers in certain classes. For HL & P's largest customers, refunds were based on actual customer usage during the period of overcollection. For all other customers, HL & P refunded the overrecoveries based upon each customer's Kwh consumption during the billing month of the refund.

4. The Financial Accounting Standards Board promulgated this Standard to deal with the accounting consequences of the effects of certain types of regulation. Standard 71 discusses the proper treatment of fuel cost overrecoveries under generally accepted accounting principles.

In early July 1990, HII paid the IRS $2,962,723.18 for 1983 (the assessed deficiency plus $1,399,705.18 in interest) and $101,570,784.90 for 1984 (the assessed deficiency plus $41,542,497.90 in interest). In late July of the same year, HII timely filed its 1983 claim for refund for $1,541,444 and its 1984 claim for refund for $50,566,278. As it had in its original tax returns, HII took the position in its refund claims that the fuel cost overrecoveries should be excluded from its gross income and that the interest liability on the fuel cost overrecovery balance should be deductible.

On June 27, 1991, the IRS decided to allow certain of HII's claims that are not presently at issue, but it failed to formally act on HII's claims for refund that are the subject of the instant motions. HII executed a Waiver of Statutory Notice of Claim Disallowance on July 19, 1991. On November 5, 1991, HII timely filed suit in this court seeking judgment against the Defendant in the amounts of $1,493,584 and $51,620,043 for federal income taxes that it alleges were wrongfully assessed for the taxable years 1983 and 1984, respectively, plus assessed interest paid on those taxes in the amounts of $1,337,526 and $35,723,846.56, respectively, plus any additional interest allowed by law.

## DISCUSSION

### *The Parties' Contentions*

The single issue raised by both motions for partial summary judgment is the proper tax treatment of that portion of plaintiff's receipts for electrical service which constituted an overrecovery of fuel costs. Plaintiff argues that money burdened by an obligation to repay does not constitute income. According to HL & P, it received the overrecoveries at issue subject to an unconditional obligation imposed by Texas law to refund the money to its customers by providing cash refunds, crediting utility bills, or offsetting against underrecoveries.

Defendant, on the other hand, argues that the overrecovery amounts constituted income because HL & P's obligation to repay overrecoveries was contingent on it not underrecovering fuel costs at any point prior to the issuance of the PUC reconciliation order. Overrecoveries might be offset by underrecoveries. Because of this uncertainty, defendant concludes that the amounts received were income to HL & P.

The Government's argument is best framed in the context of the illustration used by plaintiff's counsel in oral argument, without challenge by defendant, and adapted here by the court. Under this hypothetical scenario, HL & P might be permitted to bill 10¢/Kwh for service. A certain portion of this amount, for example 3¢, represents estimated fuel costs. Under PUC regulations, the only amount HL & P is assured of keeping is its actual and reasonable fuel costs, which are not necessarily 3¢. Actual and reasonable fuel costs in a given month, might, for example, be only 2¢/Kwh. In that case, HL & P could keep only 2¢ of the 3¢ billed.

The IRS argues that the entire fixed fuel factor amount initially recovered, 3¢, is income, despite the fact that HL & P has to treat the 1¢ differential as a liability to its customers under both PUC rules and generally accepted accounting principles. According to defendant, in the above example HL & P is guaranteed a receipt stream at a rate of 3¢/Kwh until that rate is adjusted by the PUC. Until it is ordered to return a net overrecovery after a reconciliation, HL & P cannot say with certainty that a net overrecovery balance at the end of its tax year (also the calendar year) must be repaid or credited back to customers, the IRS maintains, because the net balance may be reduced by underrecoveries in subsequent calendar years.

### *Applicable Legal Principles*

■ Section 61(a)(1) of the Internal Revenue Code defines gross income as "all income from whatever source derived...." 26 U.S.C. § 61(a)(1) (1988). The starting point in all cases dealing with the question of what is included in "gross income" is the basic premise that the purpose of Congress was "to use the full measure of its taxing power." *Helvering v. Clifford,* 309 U.S. 331, 334, 60 S.Ct. 554, 556, 84 L.Ed. 788 (1940). In recognition of the intention of Congress to tax all gains except those specifically exempted,

the Supreme Court has adopted a liberal construction of "gross income." *James v. United States,* 366 U.S. 213, 219, 81 S.Ct. 1052, 1055, 6 L.Ed.2d 246 (1961).

In determining what kind of economic benefits qualify as income for federal tax purposes, the Supreme Court has employed various formulations. It has stated that income includes all "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955). In analyzing whether a taxpayer enjoys "complete dominion" over a given sum, the Court has explained that "the crucial point is not whether his use of the funds is unconstrained during some interim period. The key is whether the taxpayer has some guarantee that he will be allowed to keep the money." *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. 203, 210, 110 S.Ct. 589, 593, 107 L.Ed.2d 591 (1990).

In addition, the Court has taught that "[w]hen a taxpayer acquires earnings, lawfully or unlawfully, *without* the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, 'he has received income....'" *James,* 366 U.S. at 219, 81 S.Ct. at 1055 (emphasis added) (quoting *North Am. Oil Consol. v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932)). It has stressed that whether payments constitute income when received "depends upon the parties' rights and obligations *at the time the payments are made.*" *Indianapolis Power & Light,* 493 U.S. at 211, 110 S.Ct. at 594 (emphasis in original).

While the Supreme Court has not directly addressed the issue presented by this case, it has dealt with the income tax treatment of utility receipts under related circumstances. In *Indianapolis Power & Light,* a utility required customers having suspect credit to make deposits with it to assure prompt payment of future electric bills. *Id.* at 204, 110 S.Ct. at 590. Prior to termination of service, customers who satisfied a credit test could obtain a refund of their deposits or could choose to have the amount applied against future bills. *Id.* at 204–05, 110 S.Ct. at 590–

91. Although the deposits were at all times subject to the utility's unfettered use and control, it did not treat them as income and carried them on its books as current liabilities. *Id.* at 205, 110 S.Ct. at 591. Upon audit of the utility's returns for the tax years at issue, the IRS asserted deficiencies, claiming that the deposits were advance payments for electricity and therefore were taxable to the utility as income in the year of receipt. *Id.* at 205–06, 110 S.Ct. at 591.

The Supreme Court rejected the IRS's position. It held that the customer deposits were not advance payments for electricity and therefore did not constitute income taxable to Indianapolis Power & Light ("IPL"). *Id.* at 214, 110 S.Ct. at 595. Although IPL derived some economic benefit from the deposits, the Court explained that it did not have the requisite "complete dominion" over them at the time they were made for them to constitute taxable income. *Id.* at 209–13, 110 S.Ct. at 593–95. The Court emphasized that IPL had an undeniable obligation to repay the deposits upon termination of service or satisfaction of the credit test and that IPL's *right to retain the money was contingent* upon events outside of its control (i.e., customer default or customer request to apply deposit to future bills). *Id.* at 209, 213, 110 S.Ct. at 593, 595.

Lower courts have addressed related issues. In *Illinois Power Co. v. Commissioner,* 792 F.2d 683 (7th Cir.1986), the Seventh Circuit held that money received by an Illinois utility pursuant to a rate increase ordered by the Illinois Commerce Commission was not income because the utility knew from the outset that it would have to repay the money plus interest. *Id.* at 688–90. Upon receipt of the surcharge, the utility had unrestricted use of the funds until the Commission decided what to do with them. *Id.* at 688. During this interim period, the utility commingled the surcharge payments with its own funds, and the payments existed only as a series of bookkeeping entries in the utility's records. *Id.* at 688–90.

The circuit court concluded, nevertheless, that the Commission's order requiring the utility to hold the money until the agency decided what to do with the funds was a

sufficient restriction as to disposition to prevent the surcharge monies from constituting taxable income. *Id.* at 689–90. In reaching this conclusion, the court emphasized that the surcharge was ordered by the Commission to promote gas conservation, not to benefit the utility. *Id.* at 688–90. The court explained that a "taxpayer is allowed to exclude from his income money received under an unequivocal contractual, statutory, or regulatory duty to repay it." *Id.* at 689. The court reasoned that in such a situation, the utility acts as a mere custodian of the money. *Id.*

A similar result was reached in *Mutual Telephone Co. v. United States*, 204 F.2d 160 (9th Cir.1953). There, a public utility commission ordered a telephone company to increase its rates in order to curtail an unexpectedly heavy demand for telephone service. *Id.* at 160–61. As part of the commission's order, the additional monies received by the telephone company were not to be taken into the company's income account until the commission authorized such action. *Id.* Although the monies were not segregated or held in formal trust, the Ninth Circuit nonetheless held that they could not be characterized as taxable income because the proceeds were received by the company burdened with restrictions as to disposition. *Id.* at 161–62. The court emphasized that "[t]he controlled circumstances under which the moneys were received and the imposed restriction as to disposition [we]re the dominant factors" in its determination that the utility did not receive these additional monies under a claim of right. *Id.* at 161.

Finally, in *Electric Energy, Inc. v. United States*, 13 Cl.Ct. 644 (1987), an electrical utility received a surcharge from the Department of Energy but was obligated to pay the surcharge out to its sponsoring companies. *Id.* at 646–48. In holding that this surcharge was not income to the utility, the court explained that the "cardinal purpose of the income tax laws is to tax the income to the person who has the right or beneficial interest therein, and not throw the burden upon a mere collector or conduit through whom ... the income passes...." *Id.* at 650 (quoting *Central Life Assurance Soc'y v. Commis-*

*sioner*, 51 F.2d 939, 941 (8th Cir.1931)). The court emphasized that Electric Energy was merely a conduit or collector of the money received, not a beneficial interest holder, and that because of the restriction imposed on the disposition of the funds received (i.e., the utility was obligated to pay out all the surcharge monies received to its sponsoring companies), the utility did not receive the surcharge under a claim of right. *Electric Energy*, 13 Cl.Ct. at 650.

### *Analysis*

■ The Government argues that HL & P's obligation to repay the amounts in question must be characterized as contingent because any particular monthly overrecovery could be reduced by a subsequent underrecovery. It argues that if the utility receives a $100,000 overrecovery in month one and then incurs a $100,000 underrecovery in month two, it can "keep" the previously received overrecovery and has no continuing duty to repay that money to its customers. In light of the principles set out above, however, it is clear that the fuel cost overrecoveries at issue in this case cannot be characterized as income. The court is persuaded that the IRS's contrary conclusion is the result of its failure to correctly characterize the effect of matching underrecoveries and overrecoveries. Moreover, the Service does not take account of the confusion caused by HL & P's need to report its income on a calendar year basis and the serendipity of the PUC's reconciliation events.

■ HL & P clearly did not have "complete dominion" over these overrecoveries as that concept was defined in *Indianapolis Power & Light*. A taxpayer has "complete dominion" if it has some guarantee that it will be allowed to keep the receipts at issue. *Indianapolis Power & Light*, 493 U.S. at 210, 110 S.Ct. at 593. Here, not only did HL & P have no guarantee of keeping the overrecoveries, it had an undeniable obligation to either repay customers directly or use the money as an offset in the event of an underrecovery. PUC Sub.Rule § 23.23(b)(2)(I); Plaintiff's Proposed Findings of Uncontroverted Fact 64–75, 108–15; Deposition of Bret Slocum, Plaintiff's Supp.Ex. K at 76–79;

Deposition of Paul C. Bellon, Plaintiff's Supp. Ex. L at 8, 35, 57–58, 62.

The Government's contrary view springs from its unwillingness to treat an offset against underrecoveries as repayment of an obligation. If, at the end of a calendar year, HL & P showed on its own fuel-recovery accounts a net overrecovery, there would be no question that those monies would be either offset against underrecoveries or returned in the form of credits or direct payments. It makes no difference what form the repayment takes. The precise dollar amounts overrecovered can never be treated as anything other than an overrecovery. Every dollar of overrecovery must eventually be repaid.[5] This is why, from an accounting standpoint, HL & P was precluded from treating these receipts as income. Whether considered on a monthly or cumulative, annual basis, at no point is the overrecovery itself recharacterized as money the utility can keep. When a prior overrecovery is offset by a current underrecovery, the utility has in effect repaid the customer. In the event of a subsequent underrecovery prior to reconciliation, there will be a dollar-for-dollar offset, with one liability canceling out the other. It is merely the fungibility of money that clouds the issue.

▮ The fact that the PUC makes its reconciliations on an irregular basis should make no difference. The "snapshot" of HL & P's income for a year is taken on December 31. At that point, if there is an overrecovery, it is unquestionably the case that customers will be repaid in some fashion. This obligation constitutes a liability on behalf of HL & P.[6] The mere possibility that a debtor will have its obligation extinguished in the future by an offsetting debt of its credi-

tor does not make the initial obligation contingent. The character of the first obligation as a liability never changes. The method of repayment is all that remains uncertain. Under these circumstances, treating the overrecovery as income is totally at odds with reality.

The analysis would be different if the PUC guaranteed a certain recovery for fuel, regardless of actual costs. Instead, however, the specific amount HL & P would ultimately be paid for fuel was contingent on its actual costs. The fuel factor was thus not a minimum or a guarantee, but a convenience, primarily for customers, to avoid constant fluctuations in power bills. In the event HL & P held an overrecovery, it thereafter held those funds on behalf of its customers. Under the PUC regulatory scheme, HL & P had no beneficial interest in those amounts. There was thus never a point at which an overrecovery was not burdened by an obligation of repayment. PUC Sub.Rule § 23.23(b)(2)(I); Plaintiff's Proposed Findings of Uncontroverted Fact 64–75, 108–15; Deposition of Bret J. Slocum, Plaintiff's Supp.Ex. K at 76–79; Deposition of Paul C. Bellon, Plaintiff's Supp.Ex. L at 8, 35, 57–58, 62.

▮ The "claim of right" doctrine is of no help to the Government. HL & P did not receive "earnings under a claim of right and without restrictions as to [their] disposition." *See North Am. Oil,* 286 U.S. at 424, 52 S.Ct. at 615. Where a taxpayer is obligated to dispose of the money it receives in a certain way, accruing no benefit to itself, the funds are considered to be excluded from the taxpayer's gross income. *Electric Energy,* 13 Cl.Ct. at 649; *see also Central Life Assurance Soc'y,* 51 F.2d at 941. The result is not

---

5. Under Texas law, HL & P's obligation to repay the money was not contingent. The PUC regulatory scheme makes clear that a utility that receives a fuel cost overrecovery must repay the overrecovery to its customers either through direct refund, credit to future bills, or offset against underrecoveries. PUC Sub.Rule § 23.23(b)(2)(I); Plaintiff's Proposed Findings of Uncontroverted Fact 64–75, 108–15; Deposition of Bret J. Slocum, Plaintiff's Supp.Ex. K at 76–79; Deposition of Paul C. Bellon, Plaintiff's Supp.Ex. L at 8, 35, 57–58, 62. In each of these scenarios, the customer is repaid the full value of the overrecovery,

plus interest. No provision in the PUC scheme enables the utility to simply treat the overrecovery money as a windfall.

6. *See Dehne v. Hillman Inv. Co.,* 110 F.2d 456, 458 (3d Cir.1940) (explaining that the term liability contemplates a duty to pay money or perform some other service); *United States v. Block & Kohner Mercantile Co.,* 33 F.2d 196, 198 (E.D.Mo.1929), *aff'd,* 37 F.2d 877 (8th Cir.1930) ("[B]efore an item can be set up as an expense [liability], it must represent an actual outlay or an actual obligation to make an outlay.").

affected by the fact that HL & P did not segregate the overrecoveries and had unrestricted use of them. *Indianapolis Power & Light,* 493 U.S. at 209, 110 S.Ct. at 593; *Illinois Power,* 792 F.2d at 688–90; *Oak Industries, Inc. v. Commissioner,* 96 T.C. 559, 570, 1991 WL 47410 (1991).

The Government attempts to rely on the decision in *Iowa Southern Utilities Co. v. United States,* 11 Cl.Ct. 868 (1987), *aff'd* 841 F.2d 1108 (Fed.Cir.1988), to support its characterization of the fuel cost overrecoveries as taxable income. In *Iowa Southern,* a public utility that received surcharge revenues to defray the construction expenses of its new power plant was not obligated to pay interest when those revenues were to be refunded in future years. *Id.* at 872–73. The court required the utility to treat the surcharges as income in the years collected, reasoning that taxpayers receive income when they exercise control over funds for their own benefit, rather than merely acting as disinterested conduits for the funds. *Id.*

*Iowa Southern* is distinguishable. First, although the utility in that case was required to repay the surcharges received, it was not obligated to pay interest on those amounts. HL & P was required by statute not only to repay its customers the fuel cost overrecoveries, but also to pay interest on those receipts. Secondly, in *Iowa Southern* the court found that the surcharge was designed to benefit the utility by helping it to recover its construction costs. *Id.* Here, on the other hand, the "fixed factor" fuel cost recovery scheme that resulted in the overrecoveries was designed to insulate customers from fluctuations in fuel costs, not to benefit the utility.

The differences between *Iowa Southern* and the present controversy are highlighted by two decisions cited by the Government, *Roanoke Gas Co. v. United States,* 91–2 U.S.Tax Cas. (CCH) ¶ 50,427, 1991 WL 214295 (W.D.Va.1991), *aff'd,* 977 F.2d 131 (4th Cir.1992), and *Southwestern Energy Co. v. Commissioner,* 100 T.C. 500, 1993 WL 185898 (1993), both of which rely on *Iowa Southern.*

In *Roanoke Gas,* the state corporation commission established public utility rates that entitled Roanoke Gas to recover its natural gas expenditures from its customers. 977 F.2d at 132. Because of the lag time between the effective date of a price change for natural gas and the implementation of a rate adjustment to reflect the change, Roanoke Gas overcollected from its customers when the price of gas declined. *Id.* at 133. At the end of each year, Roanoke Gas was required to determine the total amount it overcollected and, in effect, refund the overcollections in the next year through a rate adjustment. *Id.* The court in *Roanoke Gas* held that the utility's quantifiable obligation to reduce rates through future rate adjustment did not constitute a deductible business expense. *Id.* at 137.

The *Roanoke Gas* decision is distinguishable. The precise question there was whether overrecoveries were deductible as business expenses under § 162(a) of the IRC. *Id.* at 132. The overrecoveries there were eliminated by prompt, downward adjustments of rates. *Id.* at 133. The court emphasized that this obligation to adjust future rates possessed few, if any, of the characteristics of a liability for past overcharges. *Id.* at 136. No payment or credit was ever made by the utility and no effort was made to match refunds. *Id.* at 133–34, 136. The court found it significant that interest did not accumulate on the overrecoveries. *Id.* at 136. The overrecoveries were not maintained as a separate running balance, but rather were promptly corrected through rate adjustments. *Id.*

The present controversy addresses a different legal issue: whether fuel cost overrecoveries are includable in gross income under § 61 of the IRC. More important, the rate adjustment scheme here operates in a different fashion. Customers were compensated for overrecoveries through direct refunds, credits, or offsets, not through adjustments to rates. Furthermore, an effort was made to match refunds to large customers directly and to smaller customers by category. Finally, HL & P was obligated to pay interest to its customers on these amounts. *Roanoke*

*Gas* is therefore not on point.[7]

## CONCLUSION

In light of HL & P's obligation to repay to its customers all overrecoveries received, the receipts at issue here and the interest earned thereon cannot be characterized as income. Accordingly, plaintiff's motion for partial summary judgment is granted, and defendant's motion for partial summary judgment is denied. On or before November 7, 1994, the parties shall file a joint status report reflecting whether a Rule 54(b) judgment is appropriate at this point, and if so, whether agreement can be reached on the amount of a partial judgment. If a partial judgment is not to be entered, the parties will recommend further proceedings.

---

7. For similar reasons, *Southwestern Energy* is also inapplicable.